(No. 48239.-

CONSOLIDATED FREIGHTWAYS, INC., Appellant, v. THE INDUSTRIAL COMMISSION *et al.*—(William Grimm, Appellee.)

*Opinion filed October 1, 1976.*

Musschoot, Womack & Galich, of Chicago (Gerald W. Korey, of counsel), for appellant.

Discipio & DeCarlo, of Chicago (Vito D. DeCarlo, of counsel), for appellee.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court:

Claimant, William Grimm, sought workmen's compensation for injuries he purportedly sustained while employed as a truck driver for Consolidated Freightways, Inc. (hereinafter Consolidated). From evidence adduced at a hearing, the arbitrator found that claimant had sustained accidental injuries arising out of and in the course of his

employment causing his temporary total incapacity for 64 weeks and the permanent and complete loss of use of both legs to the extent of 35% for each, and awarded compensation. After additional evidence was presented on review, the Industrial Commission entered an award for permanent total disability. The Commission also found that claimant was entitled to additional medical expenses of $1,290.50. On *certiorari* to the circuit court of Cook County, the decision of the Industrial Commission was confirmed. Consolidated appeals, contending that the Industrial Commission's award for permanent total disability was contrary to the manifest weight of evidence and that the arbitrator's award for specific loss should be reinstated. Ill. Rev. Stat. 1975, ch. 110A, par. 302(a).

Only those facts relevant to the issues on appeal need be stated. At a hearing before the arbitrator on September 25, 1972, claimant testified that he was injured on September 21, 1970, while unloading a package from the cargo area of his truck when his foot slipped causing him to do a "split." He experienced a pain in his groin and down his left leg. The same day claimant was sent to the company physician, Dr. Falk. He was examined, given heat treatments and prescribed medication. Subsequently, in December 1970, claimant saw Dr. Shafer, who examined him and had X rays taken. Dr. Shafer hospitalized him in February 1971 for a lumbar laminectomy of L—4, L—5 on the left and exploration of the L—5, S—1 disc space. Following his operation and discharge from the hospital, claimant had seven further appointments with Dr. Shafer, with the last appointment on June 7, 1971.

Claimant additionally testified that from September 21, 1970, the day of his accident, until October 23, 1970, he worked sporadically. However, from November 1970 until June 1972 he did not work at all. He stated that he saw Dr. Falk for purposes of examination in January, March and June of 1972. Claimant returned to work on June 20, 1972, and resumed driving a truck. He noticed,

however, that he had severe pains in part of his back, his hips, and down the left leg. He also experienced pain in his right leg. While working on September 13, 1972, the pain in his legs and back became so severe he was unable to continue. On that day he saw Dr. Falk and was given medication, ointment and heat treatments. Claimant stated Dr. Falk told him on the second visit, September 14, 1972, that he should not have returned to work since he could not do the job. Dr. Falk again sent the claimant to Dr. Shafer, who examined him, had X rays taken and said he should "try and go back to work." Claimant returned to work the following day but experienced severe pain in his back and left leg. He then went back to Dr. Falk for further heat treatments. Claimant stated that he has not worked since September 23, 1972.

On cross-examination, claimant testified that he did not have pain in his right leg until the third visit to Dr. Shafer prior to his hospitalization. He admitted that in June 1971 Dr. Shafer said he should return to work. He further admitted that he had been examined by his family physician, Dr. Kaminski, in April 1972, and that the doctor told him he could return to work.

Dr. Barnett, who specialized in orthopedic medicine, testified on behalf of the claimant. He made an examination of the claimant on February 15, 1972, limited to his lower back and lower extremities. Dr. Barnett stated that he palpated the muscles of the lumbar spine area and found evidence of muscle spasm along the paravertebral group of the spinal muscles. Flexion movements of the back were examined; forward flexion was performed to 50 degrees, whereas normal is 90 degrees; backward flexion was 10 degrees, while normal is 35 degrees; and right and left lateral flexion were each 15 degrees, while normal is 40 degrees. The Ely heel-to-buttock test for lumbosacral disease was positive bilaterally, which indicated an active disease or pathological changes occurring in that portion of the back. The Gaenslen test, which is another test for

lumbosacral disease, was also positive bilaterally. The straight leg raising test on the right was performed to 80 degrees and the left to 65 degrees, while normal is 90 degrees. The Achilles reflex on the right was normal, but was absent on the left, which indicated severe nerve root involvement of the left lower extremity. Measurements of the claimant's legs indicated, by the lower dimensions of the left leg, atrophy of the left thigh and calf musculature. There was diminished sensation along the anterior aspect of the left leg and foot. X rays taken by Dr. Barnett showed evidence of narrowing of the disc spaces between L—5, S—1 and L—4, L—5. Arthritic changes involving the lower dorsal spine and the upper lumbar spine were noted. The X rays also revealed a loss of the lordosis of the lumbar spine. Dr. Barnett explained that where there is prolonged back pain and difficulty and muscle spasm, the lordosis, or the normal curve of the back, will gradually diminish so that eventually there is a flattening of the curve. Dr. Barnett opined that the claimant's condition was of a permanent nature, and that he would not be able to do the work of a truck driver.

During cross-examination, Dr. Barnett further expressed the opinion that the claimant should not do any heavy physical labor but might be able to perform some sedentary type of work. The doctor thought, however, that even in regard to the latter type of work, the claimant would have some pain and difficulties. In response to specific questioning, Dr. Barnett said that the claimant could return to driving a truck, with no lifting involved, depending upon his tolerance for pain.

Drs. Shafer and Schwartz testified on behalf of Consolidated. Dr. Shafer stated that he operated on the claimant for a ruptured disc in February 1971, and saw him numerous times postoperatively. On the final visit on June 7, 1971, he advised the claimant to go back to work with no restrictions. He further testified that he next saw the claimant on September 18, 1972, and conducted an

examination of him. This examination revealed a normal curve of the back. Forward, backward and lateral flexion were all satisfactory. There was no tenderness in the lumbo-sacral area. The straight leg raising test was performed to 90 degrees for both legs. Dr. Shafer found atrophy of the left thigh and calf as compared to the right, but he characterized this as disuse atrophy. X rays taken at this examination revealed very minimal narrowing of the L—4, L—5 disc space, which the doctor thought could be secondary to the claimant's surgery or may have existed prior to surgery. Dr. Shafer stated that in his opinion claimant could do the work required of a truck driver, and was not in need of further medical treatment.

Dr. Schwartz testified that he examined the claimant on three occasions: November 30, 1970; September 16, 1971; and June 1, 1972. Briefly summarized, the doctor stated that after each examination he found the claimant was capable of returning to work as a truck driver with no restrictions and was not in need of further medical treatment.

On review before the Industrial Commission on February 5, 1974, claimant testified that he sought further medical treatment following the arbitration proceedings. He saw Dr. Falk a number of times, and on his final visit Dr. Falk informed him that Consolidated would provide no more treatments. Claimant then visited his family doctor, Dr. Mazeika, who sent him to the Illinois Research Hospital, where he was examined by orthopedic specialists and neurosurgeons. On June 1, 1973, claimant was hospitalized until June 12 for further medical treatment. A bill from the hospital, totaling $1,290.50, was submitted as an exhibit. In July 1973, he was fitted for a back brace, which he wears 24 hours a day. In October he was referred to the Payne Clinic for further treatment. Claimant testified that he still experiences pain in his back and in both legs, and frequently has cramps and "charley horses" in his legs from his hips to his feet. He additionally stated

that the doctors, apparently from Illinois Research Hospital, told him to exercise by walking a mile or riding a bicycle or engaging in some kind of sport which he could endure. Accordingly, claimant occasionally bowls, walks and bicycles. After bowling, however, his back and legs "bother" him. His ordinary day involves very little physical activity. On cross-examination, claimant admitted that he had not personally looked for employment other than consulting a rehabilitation center, which was unable to find any employment for him. He stated that he bowled about once a week. He also admitted that one of the doctors at Illinois Research Hospital had told him he could return to work but should avoid heavy lifting.

Three medical reports were offered in evidence on review before the Industrial Commission. Consolidated offered the reports of Dr. Robert Kaminski, a family physician consulted by the claimant, and Dr. Leo Markin. Dr. Kaminski's report, which related to an examination conducted on April 28, 1972, stated that claimant was in good health, and it expressed the doctor's opinion that there was no reason the claimant could not return to a heavy or strenuous type of work. Dr. Markin's report, covering an examination on April 27, 1973, substantially supported the testimony given by Drs. Shafer and Schwartz before the arbitrator. Claimant offered a report from Dr. Irwin Barnett, which related that the doctor had examined claimant on April 23, 1973, and found no improvement from his earlier examination on February 15, 1972. Dr. Barnett still held the opinion that the claimant should not engage in any heavy physical labor.

It is the province of the Industrial Commission to determine the nature and extent of an employee's disability and to draw reasonable inferences from the evidence. (*City of Chicago v. Industrial Com.*, 60 Ill. 2d 283, 285-86.) A reviewing court may not discard permissible inferences drawn by the Commission merely because it may have drawn opposing inferences. (*Chicago Transit*

*Authority v. Industrial Com.*, 61 Ill. 2d 78, 85.) The court may consider only whether the factual determinations of the Industrial Commission are against the manifest weight of the evidence. *Pontiac Chair Co. v. Industrial Com.*, 59 Ill. 2d 261, 266.

Consolidated maintains that there is no evidence showing a permanent total disability. This same argument was raised by the employer in *Martin Young Enterprises, Inc. v. Industrial Com.*, 51 Ill. 2d 149, where, as here, the Industrial Commission increased an arbitrator's award for specific loss to permanent total disability. As we noted there, this argument begs the question. At the time of the claimant's injury, section 8(b)(7) of the Workmen's Compensation Act (Ill. Rev. Stat. 1969, ch. 48, par. 138.8(b)(7)) required that accidental injuries be established by competent evidence, "of which there are or have been objective conditions or symptoms proven." Neither this section nor the Act required objective findings of disability or of the effect of an injury upon the claimant. The determination of the extent of disability is a conclusion based upon a proper evaluation of objective conditions or symptoms. (*Martin Young Enterprises, Inc. v. Industrial Com.*, 51 Ill. 2d 149, 153; *Electro-Motive Division, General Motors Corp. v. Industrial Com.*, 32 Ill. 2d 35, 39.) While the above-mentioned provisions of section 8(b)(7) have recently been deleted by Public Act 79—79, effective July 1, 1975, this has no effect upon the fact that the extent of disability is a conclusion to be drawn by the Industrial Commission.

In the present case there is no dispute that the evidence was sufficient to establish the claimant's injury. The controversy arises from the doctors' testimony as the effect of this injury upon the claimant. Dr. Barnett expressed the opinion that claimant's condition was permanent, that he would be unable to do the work of a truck driver and would have difficulties performing even a sedentary type of work. Dr. Shafer, however, gave an

exactly opposite diagnosis. While Dr. Schwartz's testimony supported the opinion given by Dr. Shafer, we note that after his initial examination he found the claimant was not in need of further medical treatment, and yet Dr. Shafer shortly thereafter operated on the claimant for a ruptured disc. The testimony of the various doctors merely created a factual dispute for resolution by the Industrial Commission.

"An employee is totally and permanently disabled for the purpose of workmen's compensation benefits 'when he is unable to make some contribution to industry sufficient to justify payment to him of wages.' " (*South Import Motors, Inc. v. Industrial Com.*, 52 Ill. 2d 485, 488.) This does not mean, however, that an employee must be reduced to a state of total physical incapacity before he can be said to be totally and permanently disabled. In resolving the question of permanent disability, the Industrial Commission may properly consider the claimant's injury, the nature of his employment, his age, experience, training and capabilities. (*Springfield Park District v. Industrial Com.*, 49 Ill. 2d 67, 73.) The record in the instant case reveals that at the time of the accident claimant was 42 years of age, he had an eighth grade education and had worked as a truck driver since 1948. He wears a back brace 24 hours a day and complains of constant pain in his back and both legs. Medical testimony regarding his ability to engage in any type of employment was conflicting. Considering these facts and the reasonable inferences to be drawn therefrom, we cannot say that the Industrial Commission's decision was contrary to the manifest weight of the evidence.

Accordingly, the judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*