(No. 48328.—

UNITED STATES STEEL CORPORATION, Appellant, v. THE INDUSTRIAL COMMISSION *et al.*—(Carl Johnson, Appellee.)

*Opinion filed December 3, 1976.*

Rooks, Pitts, Fullagar & Poust, of Chicago (William M. Stevens, of counsel), for appellant.

Gallagher & Petrak, of Chicago (Richard F. Gallagher and Russell H. Petrak, of counsel), for appellee.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court:

Claimant, Carl Johnson, sought workmen's compensation for injuries he sustained while employed as a

construction laborer for United States Steel Corporation (hereinafter the employer). From evidence adduced at a hearing, the arbitrator found that the claimant's injuries arose out of and in the course of his employment, causing the complete loss, by amputation, of the left leg below the knee, and awarded compensation. In addition, the arbitrator ordered the employer to reimburse the claimant for medical expenses and to make a payment to the special fund under section 8(e)(20) of the Workmen's Compensation Act (Ill. Rev. Stat. 1973, ch. 48, par. 138.8(e)(20)). After additional evidence was presented on review, the Industrial Commission affirmed the award, except that credit was allowed to the employer for benefits received by the claimant under a group nonoccupational sickness and accident insurance plan. On *certiorari* to the circuit court of Cook County, the decision of the Industrial Commission was confirmed. The employer appeals, contending that the claimant's injuries did not arise out of or in the course of employment, but rather as a result of conduct which the claimant's foreman had specifically and expressly forbidden.

At the hearing before the arbitrator, claimant testified that on the day of the accident, September 14, 1972, he was instructed by the foreman to dig a sewer trench in the garage of the area 2 workshop which would require breaking through the concrete floor. To accomplish this task, the claimant was given a pneumatic hammer, a pick and a shovel. He was initially assigned to do the work alone, but shortly after he started, three other employees, who were unable to begin their assigned work, joined him. The claimant stated that during the morning a "slight item" was stuck in the path of the trench which they were unable to remove by hand. Accordingly, he went to the foreman's office to ask for the key to a forklift. The foreman was unable to find the key so the claimant went to the locker of a friend, who normally drove the forklift, and took the key he found there. He then moved the item

with the forklift and resumed working. When the claimant returned from lunch, he learned that the three men who had been working with him had been assigned to a different job. These men, however, had taken the pick and shovel the claimant had been using. He then drove the forklift, for which he still had the key, to search for Howard McNair, a co-employee who had the responsibility that day for supplying the tools required by the various work crews. Claimant drove to number 12 blast furnace, located approximately 8 to 9 blocks from his work area. He asked a fellow employee at the blast furnace where he could find McNair, and as the two men were talking, McNair arrived in a payloader, a vehicle which the work crews utilized to transport tools. The pick and shovel sought by claimant were then placed in the bucket of the payloader. McNair and claimant started to the job site, with McNair leading the way in the payloader and the claimant following in the forklift. On the way back the forklift hit a bump in the road as the claimant was attempting to pass the payloader and tipped over crushing his left leg, which resulted in its subsequent amputation below the knee.

Claimant testified that prior to the date of his accident, he had operated both the payloader and the forklift in performing his duties. On cross-examination, however, he stated that he had never been trained by his employer in the use of either of the vehicles, but that other employees had shown him how to operate these vehicles when he would ask them. He admitted that none of his supervisors had instructed him to learn how to operate the vehicles and that he did not know whether his fellow employees had any authority to show him. While he had, on occasion, taken the key from the locker of the regular driver of the forklift, it had always been done for the purpose of bringing the key to the driver and it had never been done without his permission. He states, however, that after he took the key from the locker, he

told the foreman of his action and the foreman made no comment. When questioned as to why he drove the forklift to the blast furnace, the claimant responded, "It was a long walk. I wanted to get through and I was tired." On redirect examination, he said that he had operated the forklift in the presence of two "gang leaders," *i.e.,* supervisors of laborers who are subordinate to the foreman, and McNair, and that they had never told him he was not to use this equipment.

Howard McNair testified for the claimant. He related that he was employed as a payloader and forklift operator. He learned to drive these vehicles by watching other employees, asking them how to use the vehicles, being instructed by them, and by driving the vehicles. He explained that for almost the entire four years he worked at U.S. Steel prior to the claimant's accident, the practice had been for employees to teach each other how to operate the vehicles. At no time prior to the accident had he ever received a permit authorizing him to operate a payloader or a forklift. On cross-examination, McNair testified that he had seen the claimant operating the forklift before the date of the accident. He stated that he now had a permit from his employer to drive the two vehicles, which had been issued to him in May 1973. In order to receive the permit, he attended a plant training program. He further stated on redirect examination, however, that prior to the claimant's accident it was customary for employees to operate the payloader and forklift without having been issued a permit.

Daniel Pacini, claimant's foreman, testified for the employer. He explained that each morning he would instruct the 21 men under his control on their assigned jobs. The payloader and forklift which were available to his working crew were used to transport materials and tools to the various job sites. Pacini stated that each morning he would specifically authorize two men to operate the payloader and the forklift, and these men

would normally be certified operators. He was required by the employer to fill out a daily work form listing the men in his crew and the job assignment each was to complete that day. Pacini testified that at no time did he ever authorize the claimant to operate either vehicle or assign him to any work which would require their use. He never saw the claimant operating either vehicle, nor for that matter, anyone not authorized by him. Pacini could not recall talking to the claimant regarding the use of the forklift on the morning of the accident. On that date no one was authorized to use the forklift. Pacini did remember, however, speaking to the claimant about one month before the accident at which time he told the claimant that he "didn't want to hear of him driving or being on any vehicle equipment without my authorization."

On cross-examination, Pacini stated that a certified operator is a person with a valid Illinois driver's license who has received a certificate to operate certain vehicles from the "supervisor of maintenance tech." Prior to receiving a certificate, the individual is instructed on the operation of the vehicle. This instruction would be given by a certified operator who was authorized to do so by the foreman. Pacini said that a person could drive one of the vehicles without being certified if the person was authorized by the foreman.

Raymond Carpenter, a certified operator and the man normally assigned to drive the forklift, testified that he was off work the day of claimant's accident. He kept the key to the forklift in his locker, which had been secured. Carpenter recalled that sometime within the 60 days preceding the accident, he told the claimant, who, at the time, was driving the forklift back and forth over a short distance, that he should "be cool" because he could be "busted" by plant protection for not having a license. George Vance, a group leader, was present during this incident. This was the only occasion on which Carpenter saw the claimant operating the forklift. In regard to his

own certification, Carpenter stated that he had been directed to get this by his foreman and that he had operated the forklift during a training period at the authorization of his foreman. On cross-examination, he said that claimant knew the combination to his locker. He also stated that he had never instructed other employees on the use of either the payloader or the forklift.

On review before the Industrial Commission, George Vance testified for the employer. He related that approximately two to three weeks before the accident he saw claimant operating the forklift. Vance then told Carpenter, who was present, that he should keep claimant off the vehicle, because "he is not authorized to drive" and Carpenter was the authorized operator.

The employer contends that claimant's injuries did not arise out of and in the course of his employment, since the evidence conclusively establishes that the claimant's injuries did not result from acts which he had been instructed to perform, acts which the employee might be reasonably expected to perform incident to his assigned duties, or acts which he had a common law or statutory duty to perform. Rather, the employer argues, the claimant's injuries resulted from conduct which his foreman had expressly forbidden. The claimant contends that the evidence conclusively establishes that his injuries resulted from acts which were necessary and essential for the performance of his job, acts customarily performed by the employee and other employees with the knowledge and consent of their supervisors, foreman and gang leaders, and acts which did not violate any company rule or regulation.

Claimant bears the evidentiary burden of establishing that his injuries arose out of and in the course of employment. (*Schroeter v. Industrial Com.*, 62 Ill. 2d 284, 286.) "An injury 'arises out of' employment when it originates from some risk related to the employment, thereby establishing a causal connection between the

injury and the occupation. [Citations.] A compensable injury occurs 'in the course of' employment when it is sustained while a claimant is at work or while he performs reasonable activities in conjunction with his employment." (*Wise v. Industrial Com.*, 54 Ill. 2d 138, 142.) It is the province of the Industrial Commission to resolve disputed questions of fact, and to draw reasonable inferences therefrom (*City of Chicago v. Industrial Com.*, 60 Ill. 2d 283, 285-86), and to determine the credibility of the various witnesses (*Excelsior Leather Washer Co. v. Industrial Com.*, 54 Ill. 2d 318, 326). A reviewing court may not discard permissible inferences drawn by the Industrial Commission merely because different inferences might reasonably be drawn from the same facts, for the court may consider only whether the Commission's factual determinations are contrary to the manifest weight of evidence. *Consolidated Freightways, Inc. v. Industrial Com.*, 64 Ill. 2d 312.

The argument of the employer rests upon two factors: first, that claimant was neither authorized nor assigned to operate the forklift and was expressly forbidden to do so; and second, that the use of this vehicle, whereby he sustained the injuries, was not incidental to his assigned duties. In regard to the first point, Pacini, claimant's foreman, testified that he had specifically forbidden the claimant from using the forklift, and Carpenter stated that he had reprimanded him for operating it. Claimant testified, however, that prior to his accident he had driven both the payloader and the forklift in performing his duties, that he had operated the forklift in front of group leaders without being reprimanded, and that on the morning of his accident he informed Pacini he had taken the key to the forklift without disapproval. McNair testified that he had previously seen the claimant driving the vehicle, and that it was the practice prior to the accident to learn the operation of the vehicles by asking other employees and by using the vehicles. The resolution

of this conflicting testimony and the credibility of the witnesses is for the Industrial Commission's determination.

In regard to the second point, on the day of his accident claimant was assigned to dig a sewer trench which required breaking up a concrete floor. To complete this task he was given a pick, a shovel and a pneumatic hammer. The pick and shovel were obviously necessary for his work, since they were given to him. When the claimant returned after lunch to find these tools missing, it is reasonable to expect he would search for them, and the use of an available vehicle to do so is not unreasonable considering the distance involved in this case. It must also be noted that it was in the best interests of the employer for the claimant to search for the tools he needed to complete his assigned work, rather than to sit idle. Under the factual situation presented, the Industrial Commission could have reasonably inferred that the claimant's acts were incidental to his employment.

While this court may have resolved the issues differently had we made the initial determination, we cannot say the Industrial Commission's decision is against the manifest weight of evidence. Accordingly, the judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*