F & E ERECTION COMPANY, Appellant, v. THE INDUSTRIAL COMMISSION (Jesse G. Bond, Appellee).

Fifth District (Industrial Commission Division) No. 5—86—0810WC

Opinion filed September 8, 1987.—Rehearing denied November 6, 1987.

Edward M. Vokoun, of Evans & Dixon, of St. Louis, Missouri, for appellant.

William D. Hanagan, of Hanagan & Dousman, of Mt. Vernon, for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Claimant Jesse G. Bond sought benefits under the Illinois Workers' Compensation Act (Ill. Rev. Stat. 1979, ch. 48, par. 138.1 *et seq.*) for various injuries sustained when he fell down a 40-foot metal stairwell while working for respondent F & E Erection Company in North Dakota. An arbitrator concluded that no Illinois jurisdiction existed because claimant had failed to prove the existence of an Illinois employment contract. The Industrial Commission reversed, finding an Illinois employment contract and finding a causal connection between claimant's ill-being and the work accident. The Commission awarded medical expenses and temporary total disability benefits of $258.97 per week for 261$^{3/7}$ weeks. The Commission found that its award was not a bar to a further award of temporary or permanent disability compensation, and consequently remanded the cause to the arbitrator for further proceedings. On administrative review, the circuit court of Jefferson County granted claimant's motion to quash the review on the basis that no jurisdiction existed where the Commission's decision was not

final because it had remanded the cause to the arbitrator for further proceedings.

On appeal, respondent contends that the Commission's decision was final and appealable, and that the decision of the Commission is against the manifest weight of the evidence and contrary to law. Respondent argues that the Commission erred in finding an Illinois employment relationship, erred in finding claimant was not estopped by his election of remedies; and erred in awarding benefits from the date of the accident to the date of review because claimant had not been under active medical treatment and was not actively seeking employment.

In 1977, the 30-year-old claimant began working for respondent as an electrician, building large mining machinery. He filled out a job application at that time. Jack Hockey was respondent's vice-president and was the electrical supervisor in Illinois. Hockey hired claimant in Harco, Illinois, at the Amax-Delta mine. There was testimony regarding several related companies. The three companies, respondent, Adco Electric and CDK Contracting, were all part of the same parent organization called the Commercial Contracting Company of San Antonio, Inc. Claimant had worked for all three companies. The three companies shared the same post office box address in Texas. Adco and respondent were located in Texas, but the recordkeeping functions of CDK were housed in New Mexico. In 1979, Hockey was president of Adco and vice-president of respondent.

Claimant testified that the Harco, Illinois, job for which Hockey had hired him in 1977 entailed building a "drag line" at the Amax-Delta Mine for Amax Coal Company. He worked on that dragline for about 2½ years. During that time, when a union strike took place in the Illinois mine, Hockey sent claimant to Texas to work for Adco. When the strike was over, claimant returned to Illinois and continued working for respondent.

In late spring or early summer 1979, claimant was hired by Amax Coal Company. Claimant testified that typically, when most of the construction work is completed on a dragline, most of the electricians go to work for the coal company. Claimant, therefore, was hired by Amax as an electrician to work at the same site and on the same machinery. Claimant worked for Amax for two or three months, but did not wish to continue, and he gave Amax two weeks' notice. He last worked for Amax on September 14, 1979.

The office trailer of respondent was still on the Amax property, as respondent was completing its work on the dragline. Approximately two weeks before claimant stopped working for Amax, claimant went

to the trailer before work to talk with Hockey. Several other men were present, including respondent's president and the job supervisor. Claimant told Hockey he would like to work for respondent again. "Jack said he would hire me." Claimant continued, "He told me he hired me for no specific company at the time. He told me that we would make arrangements later, that he would contact me and I could be in contact with him to make arrangements for me to go to the job that he needed me at and that would best suit my needs." Hockey told claimant that four or five different jobs were available, including several jobs in Texas, one in North Dakota, one in Montana and one in Arizona.

Claimant and Hockey subsequently exchanged several telephone calls. Hockey specified "more clearly which jobs I could go to and he gave me a choice because money was better at some jobs and they could provide room and board for me at other jobs." Claimant told Hockey he preferred to go to North Dakota and Montana jobs instead of the Texas jobs. Hockey told claimant to "go up to North Dakota and check that job out and see how near ready they were for me to come there. And then I was to proceed to the Montana job at Cold Strip, Montana and work there until they were ready for me to come back to the North Dakota job ***. [F]rom the time I left I was frequently in contact with Jack."

The first time claimant went to North Dakota, he stayed with a supervisor. John Glover, the electrical supervisor, met with claimant and later showed him the jobsite in order "to see if that machine was ready for more electricians to come in and work on the crew." Claimant denied that he stopped in North Dakota to see if any work was available. "I stopped because Jack told me to check in and see if they were ready for me then or should I proceed on to Montana." Claimant denied that a supervisor such as Glover had the power to say whether or not he could work, *e.g.*, because he did not have the experience or did not have the green card necessary for mining electrical work. "No, not in this case because Jack Hockey was above him and I did have the green card and he already told me to go to work and Mr. Glover knew I was coming." The machine was not ready, and thus, according to Hockey's instructions, claimant proceeded to the other jobsite in Montana.

In December 1979, claimant began working in Montana for CDK Construction Company, where he worked until March 28, 1980. He was paid on CDK payroll checks. Claimant filled out a W-2 form and insurance papers in Montana. Claimant paid his own travel expenses between Illinois, North Dakota and Montana.

Claimant was in frequent contact with Hockey while in Montana. He denied telephoning Hockey inquiring about jobs, because they "had already established that [claimant] was going to North Dakota." Claimant telephoned Hockey "mainly to let him know each week how that job was going and he said he would let me know when I was supposed to go up" to North Dakota. Hockey had told claimant "in Illinois even before I went to Montana" that he was to go to North Dakota.

One telephone call from claimant in Montana to Hockey in Texas concerned problems claimant was having with the machine. "[W]e tried to get it straightened out and then Jack sent another man that works for him, Roger Codanti, up to check it out from what I had told Jack to see what all was going wrong." In addition, Glover "came down from North Dakota and checked it out also after I had talked to Jack on the phone. Then when it started going more smoothly, I talked to Jack and he said, well, it would be time for me to go up to North Dakota. Then I contacted John Glover in North Dakota and he said, yes they were ready to have me and I went on up there." This occurred in April 1980. During this period, claimant returned to Illinois to visit his family several times.

Claimant did not recall filling out a job application "other than the one at F & E Erection in Harco, Illinois." He filled out W-2 and insurance forms in North Dakota. His paychecks carried the name of respondent. Claimant again met with Glover, but denied that he had to see Glover before he could go to work. Glover did tell him, however, "which jobs I was supposed to work on." Claimant also denied that Glover hired him. He emphasized that Hockey had hired him, and that he knew he would be working in Montana and North Dakota before he went to the jobsites. Claimant testified further that when he went to the Montana and North Dakota jobsites he was not subjected to any interviews. Instead, he was simply shown the jobsites.

Hockey testified that the F & E operation in Illinois was closed in September 1979. When Hockey returned to the F & E corporate office in Texas, he took charge of Adco. Hockey had no responsibility for hiring electricians for respondent in 1979 or 1980 after he left Illinois. Hockey believed claimant was still working for Amax Coal at the Illinois mine when Hockey left Illinois in early September.

Hockey testified further that he vaguely remembered a conversation between himself and claimant in respondent's trailer in 1979, a few weeks before claimant left Amax. Hockey recalled claimant saying he was not happy at Amax. He planned to quit Amax, and wanted to know if respondent had any available jobs. "I advised Jesse that there were other jobs at F & E and various other associated companies had

going and whenever he made his commitment and did whatever he had to do, he could give me a call in San Antonio and we could see what we could do about finding employment for him at that point." Hockey denied promising claimant a job at any time.

Hockey testified that at some point claimant telephoned him saying that he had quit Amax and was looking for employment. In the "Fall, or probably about November of 1979," Hockey received a call from the vice-president of CDK inquiring about electricians for the job in Montana. Hockey spoke on the telephone with claimant in Illinois. "I can't verify who called who. All I know is we had conversations." Hockey then told claimant that "CDK, our sister organization, in Farmington had a drag line going in Montana and that they were looking for electricians out there, would he be interested in that particular job." Hockey told claimant to contact CDK's vice-president in New Mexico "to discuss the particulars of this employment, *i.e.*, salary and whatever arrangements were to be made." Hockey denied having the authority to hire anyone for CDK because he held no position with CDK. His relationship with CDK was "just a loose association." Hockey again denied promising claimant a job in Montana.

Hockey testified that in 1980 claimant telephoned him several times "from the Montana job and, you know, pretty much, you know, tell me, 'Hey. This is what's going on,' or whatever and, you know, we had talked about possible employment with, on the North Dakota job site. I knew that he had gone by and seen John from talking to John at the time, but a lot of it was to the effect of, 'Hey, Jack. This is what's going on on the job out there.'" Hockey continued, "Jesse finally called—to the best of my recollection, he had said something about the fact, 'Well, I'm getting ready to leave,' and I can't remember whether he was done out there or whether there was a problem or why, you would have to, you know, specifically ask. But when he got ready to go, I said, 'Get ahold of John Glover,' and he called John." Hockey admitted that when claimant would call to report his status or find out what was going on, he would call Hockey. Hockey agreed that he was the "man the Jesse dealt with most of the time." Hockey testified further that Glover was the electrical superintendent at the North Dakota jobsite, and was in charge of selecting the electrical crew. Hockey went on to say that claimant later telephoned him,

> "and said, you know, 'John and I have talked but I need two weeks off to go back to Illinois and take care of personal matters.' I said, 'Look Jesse. Whatever you have worked out with John is fine with me. You know, if you need two weeks off and he can spare you, that's great.' Jesse called about two weeks

later or so and said, 'Jack I just wanted to let you know I'm not going to be able to get back as quick as I thought to the jobsite in North Dakota.' And I told him, I said, 'Look, Jesse. As long as John knows that you're going to be late and you all have worked that out, that's fine. Because you've got to check everything through John.' "

Hockey testified further regarding whether he had authority to hire "men like" claimant. "It would depend on the position that they were hired for. Normally people in the crew are always subject to the approval of the superintendent and the people they've got to work for. *** I may say, 'Well, look. Here's a good individual. You have to look at him and you talk to him.' " At the various jobsites for respondent in 1980, 80% of the electricians were hired locally and 20% of the electricians "follow the electrical work to the different sites" and are physically hired on the site.

Hockey testified that at such site the "insurance paper work and the W-4 or whatever is always filled out. That information though, if you've been on one job with the company and you're terminated off that job, the paper work of that jobsite goes back to the corporate offices and stored on microfilm or whatever and each jobsite retains their own paper work as far as the proceedings for payroll and what not." Hockey testified further that claimant "would have been required to fill out paper work on the jobsite he went to." Hockey characterized claimant as an excellent worker.

Hockey testified that claimant traveled to the Montana and North Dakota sites as a direct result of his conversations with Hockey. Hockey testified that he frequently refers former employees to a jobsite, and tells them to check with the superintendent at the site to see if he needs anyone. Hockey does not hire these people. Hockey recalled speaking to Glover about claimant. He told Glover claimant was coming to the site, and he recommended claimant as an employee.

Glover testified that as electrical supervisor at the North Dakota site, he "had the ultimate authority to hire and fire on the job." He hires some electricians from the jobsite. "Many of them I ask people all over the United States with the company, with other companies for referrals." Glover hired claimant. Hockey did refer claimant, but Glover had previously rejected others referred by Hockey.

Glover testified that he did not know whether claimant had filled out an application for employment by respondent when he was first hired at Harco, Illinois, or whether he filled out an application in North Dakota. "There is a record and I don't know whether he filled out the one there or not, but we did have a personal [*sic*] record that included

an application for employees." The North Dakota office did not get the application from Harco, Illinois.

Claimant was injured in North Dakota on May 20, 1980. He was carrying his tools, and picked up a roll of cable and a gallon jug of oil to carry down to the tool room. He started to walk to the stairway when he tripped and fell. It was a "construction site built" stairway made out of pieces of torch cut pipe and expanded metal. It was approximately 6 feet wide, 40 feet long, and was at a 45° angle.

Claimant was unconscious and taken to the hospital, where he remained for nearly one month. He was treated for craniocerebral trauma, multiple bruises, and obstruction of the urethra with hematuria. Some weakness on his left side was noted. During his stay in the hospital, claimant initially received drug therapy to reduce the brain swelling, and he became less dizzy and experienced fewer headaches. Since the day of the accident, claimant has not been able to walk without the use of crutches or some other assistance because of the pain in his back. He can put 17 to 20 pounds of weight on his left foot. Claimant experienced some depression prior to the accident. After the accident, his emotional problems worsened considerably. He suffered from feelings of worthlessness, depression, and had thoughts of suicide.

Claimant testified further that following the accident, he has had no training in any type of work which would enable him to make a living doing sit-down work. Respondent's insurer had not offered any type of rehabilitation training. Claimant testified that he had been asking around about jobs and over the last two years had answered some 15 to 20 advertisements. He could drive a car when necessary. He could not sit for extended periods of time. In February 1981, claimant entered training for the ministry or as a youth counselor. He also spent three months in early 1982 mapping out electrical work for a construction project for a ministry in return for which he was given room and board. This did not involve physical work.

In January 1982, claimant was involved in a car accident. His back condition was aggravated by the accident, but eventually returned to its previous condition. In August 1982, claimant fell when his crutch caught on something. He was hospitalized for acute lumbosacral sprain.

Dr. R. Anthony Marrese, an orthopedic surgeon, testified by deposition for claimant that he first saw claimant on September 20, 1982. His thermogram of the left leg was abnormal, indicating involvement of the L4-L5, and L5-S1 nerve roots. He had a three-centimeter difference between the calves of his right and left legs. He was unable to bear weight on his left leg. Dr. Marrese diagnosed multiple nerve

root involvement from causalgia characterized by burning pain in the left leg or sympathetic reflex dystrophy. Dr. Marrese opined that claimant was totally and permanently disabled. Claimant would always need to use crutches because of weakness and hyperesthesia in the left leg. He could not do upper extremity work due to his constant pain and dysasthesia in his left lower extremity. The fact that claimant might be able to do his own cooking and cleaning did not alter Dr. Marrese's opinion. Dr. Marrese's records showed a history obtained from claimant that he was employed by respondent for four years as a construction electrical worker.

Dr. James B. Stiehl, an orthopedic surgeon, testified in a deposition for claimant that he treated claimant on August 8, 1982, in the hospital for lumbosacral sprain with mechanical low back pain after he fell at a theatre when his crutches slipped. Dr. Stiehl believed "that there is a possible causal relationship between a severe back injury where a person would fall forty feet and recurrent episodes of pain in the lower back."

Dr. Jean Modert, a physician and surgeon, testified in a deposition for claimant that he first saw claimant in late June 1980, about one month after the accident. His primary complaint was regarding back and left hip and leg pain. He also had some urinary tract problems. In June 1981, claimant was admitted to the hospital after he fell when his crutches slipped on wet pavement. The final diagnosis at that admission was acute back strain and contusion to the area of the lumbar spine. Dr. Modert testified that claimant also had a severe psychological overlay. In 1983, Dr. Modert treated claimant several times for back pain and left leg pain, gastric upsets, nervousness and anxiety. He last saw claimant in September 1983.

Dr. Modert testified that he saw "essentially no improvement in the man's condition. He's been seen by numerous consultants and many diagnoses have been offered, none really conclusive other than that he states all of his happenings are from the date of his injury at which time he did sustain substantial injury. I feel that the condition has long since reached a state of permanency, and that his disability is considerable." While Dr. Modert did not recall prescribing crutches, claimant had seen numerous physicians and Dr. Modert could not state whether or not claimant elected to use crutches on his own. Dr. Modert was of the opinion that claimant could perform work of a light and sedentary nature, such as sitting at a bench and using his arms and upper torso. Claimant was employable in some capacity as long as he did not have to use the lower extremities extensively.

Dr. Marshall B. Conrad, an orthopedic surgeon, testified for claim-

ant in a deposition, and wrote a report, indicating that he examined claimant on April 21, 1983. Claimant exhibited an "obvious atrophy of the left thigh and the left calf and there is an irregular bluish discoloration or cyanosis of the entire left leg." The left thigh is three centimeters smaller than the right, and the left calf is two centimeters smaller than the right. Muscle atrophy can be the result of an injury to the muscle, an injury to the nerve that supplies the muscle, or simply from disuse. Dr. Conrad could not determine the cause of claimant's atrophy, but thought it was probably from disuse. Claimant presented a "puzzling clinical picture" which included a soft tissue back injury, a head injury, and a genitourinary injury.

Dr. Conrad testified that, without regard to any psychiatric problem, he believed "it would be most unlikely that [[claimant's] ever going to be able to get back to work whatever the cause of his problem is." A person with claimant's condition might be able to engage in some form of gainful employment. Dr. Conrad stated that even with rubber tips, crutches will slip on a wet or slippery spot on the floor.

Dr. Gallean Heisten, a psychiatrist, testified by deposition for respondent that she treated claimant from July 6, 1981, through September 13, 1981, for depression. As of September 1981, after a consultation with the department of rehabilitation medicine, Dr. Heisten believed, from a psychiatric standpoint, that claimant could return to work as a construction electrician, but might have to limit his physical efforts, including climbing or lifting. The staff agreed with claimant that he should pursue his desire to undergo vocational training as a minister to youth as soon as possible.

Dr. James Haddock, a psychiatrist, testified for respondent that he had examined claimant on October 18, 1983, at respondent's request. Claimant was free of any psychiatric illness, but had an underlying unstable personality in which he reacted excessively. This personality disorder had been present for approximately 5 or 10 years. No psychiatric condition was present which related to the May 1980 work accident. Claimant overreacted emotionally even prior to the accident. From a psychiatric viewpoint, claimant was able to work.

As of August 24, 1982, claimant had received $59,420.67 from the North Dakota Workers' Compensation Bureau, which included $22,159.72 for compensation, $7,035.33 for rehabilitation, and the balance for medical expenses. Disability benefits were paid for the period from May 20, 1980, through June 18, 1982. The Bureau found claimant had completed job training as a youth counselor in June 1982. Medical reports and psychiatric reports indicated there was no basis for continued disability as early as June 1981. Medical reports indicated, how-

ever, a severe and ongoing psychosis problem. There was no evidence that the continued problems were related to the 1980 injuries. Claimant had suffered a nonwork related injury in a January 1982 automobile accident. Claimant was able to work and was not entitled to benefits after June 18, 1982. Claimant filed a request for rehearing on August 17, 1982, which is still unresolved, pending the decision in the present Illinois matter.

On March 12, 1984, the arbitrator here concluded that Illinois was without jurisdiction to hear the matter because no new employment contract with respondent had been entered into in Illinois after claimant left respondent in April 1979. The arbitrator made no findings as to the other issues.

On May 16, 1986, the Commission reversed the arbitrator. It also found that claimant was temporarily totally disabled. It awarded temporary total disability benefits for 261$^{3}$/$_{7}$ weeks. The Commission then stated that "[T]he Commission remands this case to the arbitrator for further proceedings pursuant to *Thomas v. Industrial Com.* (1980), 78 Ill. 2d 327, 399 N.E.2d 1322."

On November 21, 1986, the circuit court of Jefferson County entered an order quashing review proceedings. The court held it was without jurisdiction because the decision of the Commission was not final since the Commission had remanded the case to the arbitrator. Respondent appeals from that trial court order and from the Commission's award of benefits to claimant.

■ Respondent first contends that the circuit court erred in finding it was without jurisdiction because the Commission had remanded the case to the arbitrator. We agree. Only final determinations of the Commission are reviewable. (*American Structures, Inc. v. Industrial Com.* (1983), 99 Ill. 2d 40, 457 N.E.2d 701.) The Commission here awarded temporary total disability benefits under section 19(b). (Ill. Rev. Stat. 1985, ch. 48, par. 138.19(b).) That section expressly permits a finding that the disabling condition has not yet reached a permanent condition.

> "The Arbitrator may find that the disabling condition is temporary and has not yet reached a permanent condition and may order the payment of compensation up to the date of the hearing, which award shall be reviewable and enforceable in the same manner as other awards, and in no instance be a bar to a further hearing and determination of a further amount of temporary total compensation or of compensation for permanent disability, but shall be conclusive as to all other questions except the nature and extent of said disability." Ill. Rev. Stat. 1985, ch.

48, par. 138.19(b).

■ Furthermore, the decision of the Commission shall be "conclusive unless reviewed" as provided in the Act. (Ill. Rev. Stat. 1985, ch. 48, par. 19(f).) The decision of the Commission, therefore, could properly be appealed, notwithstanding the need to later remand to the arbitrator for a finding on the issue of permanency. See *Thomas v. Industrial Com.* (1980), 78 Ill. 2d 327, 399 N.E.2d 1322.

■ Respondent next contends that the Commission erred in finding an Illinois employment contract. The Illinois Workers' Compensation Act is designed to have an extraterritorial effect. (*United Airlines, Inc. v. Industrial Com.* (1983), 96 Ill. 2d 126, 449 N.E.2d 119.) Covered employees include "[e]very person in the service of another under any contract of hire, express or implied, oral or written, including persons whose employment is outside of the State of Illinois where the contract of hire is made within the State of Illinois." (Ill. Rev. Stat. 1985, ch. 48, par. 138.1(b)(2).) The place where the last act necessary to give validity to the contract occurs is the place where the contract was made. (*Youngstown Sheet & Tube Co. v. Industrial Com.* (1980), 79 Ill. 2d 425, 404 N.E.2d 253.) Whether the contract of hire was made within Illinois is a question of fact for the Commission. *United Airlines, Inc. v. Industrial Com.* (1983), 96 Ill. 2d 126, 449 N.E.2d 119.

The record contains sufficient evidence to support the Commission's finding that the accident occurred while claimant was working under a contract of hire which he entered into in Illinois. After his Illinois hiring by respondent in November 1977, claimant worked exclusively for respondent until April 23, 1979. He then worked for Amax Coal until September 14, 1979. Claimant's recitation of his September 1979 conversation with Hockey in Illinois was credible. According to claimant, Hockey promised him a job, but could not specify which of the related companies or locations he would go to after leaving Illinois. On that basis, claimant gave Amax Coal notice that he was quitting. Significantly, respondent's practice of sending an electrician to a sister company's jobsite outside of Illinois was not unusual. Respondent had previously sent claimant to work for Adco in Texas during an Illinois strike.

Moreover, there was no evidence to contradict claimant's testimony that he filled out a job application when he was originally hired by respondent in Harco, Illinois, but did not submit a new application in North Dakota or Montana. Glover was apparently unsure whether there was an application in the personnel file in North Dakota. Hockey testified that the personnel paper work from one jobsite goes "back to

the corporate offices and [is] stored on microfilm."

Hockey's version of the oral transaction in Illinois did not differ substantially from that of claimant. Hockey advised claimant that "there were other jobs at F & E and various other associated companies." Hockey's assertion that the actual hiring was done at the worksite was apparently nothing more than an administrative confirmation, at least in claimant's case, of Hockey's previous act of hiring claimant in Illinois. Hockey could list only two possible functions attributable to the on-site supervisor—to look for potential personality problems and give out actual salary information. Claimant was to contact the CDK vice-president merely to discuss "salary and whatever arrangements were to be made."

Claimant and Hockey continued communicating over the telephone while claimant remained in Illinois. Claimant's first trip to North Dakota did not appear to encompass a job application and interview. After a tour of the jobsite and inspection of the machinery, he let Hockey know that they were not yet ready for him. Hockey instructed claimant to go to Montana.

Hockey admitted that while working on the Montana site, claimant telephoned to inform Hockey of "what's going on, or whatever and, you know, we had talked about possible employment with, on the North Dakota jobsite." While in Montana, claimant and Hockey remained in frequent contact with each other. Claimant telephoned Hockey each week to keep him up to date regarding the progress at the jobsite. When claimant's machine was causing problems, claimant telephoned Hockey, who sent Codanti to fix the machine. Glover also came from North Dakota to see the machine. When claimant was ready to leave Montana, Hockey concedes that he instructed claimant to contact Glover in North Dakota. Hockey also testified that he could tell on-site supervisors, particularly as to employees such as claimant for whom he had high regard, that they had to see and talk with the employee.

In addition, when claimant needed two weeks off to go back to Illinois, and later needed an extension, it was Hockey who gave permission. Hockey testified that he told claimant, "Whatever you have worked out with John is fine with me. You know, if you need two weeks off and he can spare you, that's great." Finally, when Hockey informed claimant to go to North Dakota, claimant went there and began working.

Furthermore, Glover testified that he hired electricians from all over the country who were all "with the company." It is unclear whether or not "the company" refers to the parent company which

encompasses Adco, respondent and CDK.

The factual setting presented here permits the Commission to find that the various jobsites, different States, and interrelated companies functioned together as one company in some respects. Unlike many other professions, as a construction electrician, claimant (along with 20% of the electricians respondent hires) could follow electrical work from site to site. The Commission was entitled to find that under the factual setting presented to it, there was a continuous employment relationship between respondent and claimant following claimant's September 1979 conversation with Hockey in Illinois when Hockey hired claimant for one or more of these "loosely associated" companies. (See *Continental Drilling Co. v. Industrial Com.* (1987), 155 Ill. App. 3d 1031, 508 N.E.2d 1246.) The Commission could properly find that claimant was not merely traveling from one jobsite to another with a mere expectation of work and a recommendation from a former employer.

The record supports the Commission's finding that Hockey's conduct in using employees of the sister corporations or subsidiaries at the various jobsites under the control of those subsidiaries reflected "a practice of treating the employees of the subsidiaries as employees of the parent company." The Commission cited as examples of such a practice Hockey's sending claimant from Illinois to Texas during a strike in 1979; Hockey's dispatching Condanti to Montana to repair a machine under the control of CDK; and Hockey's sending claimant to North Dakota on a jobsite under the control of respondent. The Commission's finding that claimant was injured while working under an Illinois employment contract was not contrary to the manifest weight of the evidence. Accordingly, the Commission had jurisdiction to entertain claimant's application for adjustment of claim.

Respondent next contends that by his election to accept North Dakota benefits, claimant was precluded from receiving benefits in Illinois under the doctrine of election of remedies, until such time that he has completed all action on the North Dakota proceedings. The application of that doctrine depends upon whether double compensation is threatened, whether the employer has been misled by claimant's conduct, and whether *res judicata* should apply. (*Long-Airdox Co. v. Industrial Com.* (1984), 128 Ill. App. 3d 334, 470 N.E.2d 1307.) Respondent focuses on the threat of double compensation, arguing that claimant must first reach a final determination in North Dakota, and then he may apply for benefits in Illinois.

North Dakota stopped paying benefits to claimant in June 1982. The only unresolved item in that State is claimant's rehearing

petition, which remains pending until respondent's challenge to the Illinois claim has been resolved. We find nothing in the statute which prohibits the particular procedural action presented under this factual setting. Double recovery is not a threat where the compensation paid by North Dakota will be credited against the award made in Illinois. (See *Long-Airdox Co. v. Industrial Com.* (1984), 128 Ill. App. 3d 334, 470 N.E.2d 1307.) Respondent's suggestion that the two States "would not know about that which had been awarded against the other party and could not claim a credit which is allowed under the principles of workers' compensation law" is unsupported by the record. The parties have not shown this court any evidence in the record of communication difficulties between the two State agencies and the parties themselves.

■■ ■ Respondent finally argues that the Commission's finding that claimant was temporarily and totally disabled up to the date of the hearing was against the manifest weight of the evidence. Respondent maintains that, in its decision dated May 16, 1986, the Commission found claimant "had not received any medical treatment since August of 1984." The Commission made no such finding. It only commented that claimant was "not presently under treatment and is not presently taking medication."

Respondent also points out that Dr. Conrad found claimant physically capable of sedentary work as of April 1983 and that Dr. Haddock found claimant able to work from a psychiatric standpoint as of October 18, 1983. Dr. Conrad, however, also stated that it was "most unlikely" that claimant could ever go back to work, although he might be able to find some type of gainful employment. The Commission was entitled to give weight to Dr. Marrese's opinion that claimant would be unable to hold a regular job because he would always need crutches and be in pain due to the weakness and hyperesthesia of his left leg.

Moreover, the Commission was entitled to place greater weight on the opinion of Dr. Modert, the one physician who treated claimant over a period of several years. Dr. Modert opined that over the four-year period of 1980 through 1983 he did not see any improvement in claimant's condition. He found the injuries all stemmed from the date of the 1980 injury. While claimant might be able to do some light work, the disabilities he suffered were considerable. It is the function of the Commission to resolve conflicting medical testimony, and its decision will not be disturbed unless contrary to the manifest weight of the evidence. (*Goldblatt Brothers, Inc. v. Industrial Com.* (1979), 78 Ill. 2d 62, 397 N.E.2d 1387; *Reynolds v. Industrial Com.* (1986), 151 Ill. App. 3d 695, 502 N.E.2d 1178.) In view of the medical evidence presented to the Commission, we cannot say that its finding of temporary total dis-

ability is against the manifest weight of the evidence.

 Respondent also argues that claimant has failed to show that he is unable to work. An employee is totally disabled when he is unable to make some contribution sufficient to justify payment of wages. (*Consolidated Freightways, Inc. v. Industrial Com.* (1976), 64 Ill. 2d 312, 356 N.E.2d 51.) Claimant must prove by a preponderance of the evidence the extent and permanency of his injury. (64 Ill. 2d 312, 356 N.E.2d 51.) If the employee can establish that, although he is not altogether incapacitated for work, he is so disabled that he cannot work regularly in a well-known branch of the labor market, the burden shifts to the employer to show that some kind of suitable work is regularly and continuously available to the employee. (*Reynolds v. Industrial Com.* (1986), 151 Ill. App. 3d 695, 502 N.E.2d 1178.) Causation and the permanency and degree of disability are issues of fact for the Commission, and its decision will not be set aside unless it is against the manifest weight of the evidence. (*Wallace v. Industrial Com.* (1983), 98 Ill. 2d 33, 455 N.E.2d 92.) As we have stated, the Commission was entitled to find that claimant was totally disabled, and thus was unable to work regularly in a well-known branch of the labor market. Respondent has not carried its burden of proving that some kind of suitable work is regularly and continuously available to claimant.

 Claimant asks this court to remand with directions to award section 19(k) penalties because respondent has undertaken proceedings which are allegedly frivolous or for purposes of delay. (Ill. Rev. Stat. 1985, ch. 48, par. 19(k).) Penalties are not ordinarily imposed where the employer's conduct in relying on medical opinions was reasonable. Such an issue is a factual question for the Commission to resolve. *Consolidated Freightways, Inc. v. Industrial Com.* (1976), 64 Ill. 2d 312, 356 N.E.2d 511.

Here, there was also a jurisdictional question. We find nothing in the record that would require the Commission to impose penalties upon respondent.

For the foregoing reasons, the judgment of the circuit court of Jefferson County is vacated; the decision of the Industrial Commission is affirmed; and the cause is remanded to the Commission for further proceedings.

Judgment vacated and cause remanded.

BARRY, P.J., and WOODWARD, McCULLOUGH, and KASSERMAN, JJ., concur.