ENERGY ERECTORS, LTD., Appellee, v. THE INDUSTRIAL COMMIS-SION *et al.* (Mary Lee DeLong, Widow of John R. DeLong, Appellant).

Fifth District (Industrial Commission Division)   No. 5—91—0259WC

Opinion filed June 22, 1992.

John E. Rhine, of Fowler, Rhine & Ernest, of Mt. Carmel, and Alan M. Hux, of Indianapolis, Indiana, for appellant.

Edward M. Vokoun, of Evans & Dixon, of St. Louis, Missouri, for appellee.

PRESIDING JUSTICE McCULLOUGH delivered the opinion of the court:

Following the death of John R. DeLong, the petitioner, Mary Lee DeLong, brought a claim for workers' compensation. The arbitrator rendered a decision in favor of the respondent, ruling that Illinois had no jurisdiction over the claim. The Industrial Commission (Commission) reversed the arbitrator's decision, finding that it had jurisdiction to hear the claim. The circuit court reversed the Commission's decision. The petitioner appeals. We affirm.

The sole issue to be decided is whether the contract of employment occurred in Illinois, thereby allowing the petitioner's claim to fall within the coverage of the Illinois Workers' Compensation Act (Act) (Ill. Rev. Stat. 1989, ch. 48, par. 138.1 *et seq.*). It is undisputed that John worked for the respondent, Energy Erectors, at the time of his death. However, the facts regarding where the employment contract was entered into are in dispute.

The record shows that John had been a lifelong resident of Illinois. He and LeRoy Olson, the respondent's project supervisor, became friends while both were working on a coal mine construction site in Carmi, Illinois, although each worked for different companies. Olson testified that while working in Carmi, he told John, "if I got another job he could come to work for me."

Thereafter, Olson went to work as project superintendent for the construction of an underground mine in Mavisdale, Virginia. Olson, as project superintendent, made the decisions whether to hire an applicant at the jobsite. When asked what an applicant would do when he arrived at the jobsite, Olson answered:

> "[Y]ou got to make out your withholding statement, and we had a safety book they had to read—they had to sign a page in that safety book that they understood our safety laws. And we also had some laws on the job. You couldn't drink on the job, lunch hours and so on. And they had to sign that.
>
> They were also taken on a tour of the job site."

He also testified that if an applicant came in and filled out an application but did not do one of these procedures, he would not be hired. With respect to the DeLongs and their telephone conversations, Olson testified:

> "Mary would call my wife, you know, maybe once a week or whatever and ask if I could use Bob yet, and I would say, as soon as I can use Bob I'll call you. So one day I told the wife to call Mary and tell Bob to come out and go to work."

With respect to the telephone call to John to come to Virginia to go to work, Olson did not believe and could not recall whether he actually talked on the phone but he believed that his wife talked to Mrs. DeLong. He did testify, "I told my wife to tell Bob I can use him, 'come out and go to work.' May be that isn't exact words. But as far as I can remember anyway." In response to a question as to what John had to do to come out and get a job, Olson answered, "Just come out to the job and sign up." He also testified that John would have to come out to Virginia if he wanted the job and that if he did not come to Virginia he would not get the job. He further testified

that when John came to Virginia, he signed the tax forms, signed the safety book, and was processed in the same way as anyone else who wanted to come and work for Energy Erectors at the job in Virginia. In answer to the question whether there was any difference between the way John was hired as compared to anyone else hired at the job in Virginia, Olson answered "No." He also testified that he could have rejected John if, for example, he showed up and had been injured and could not work. Olson testified that until John actually got out to Virginia and filled out the papers, he would not be hired as an employee.

Mrs. DeLong testified concerning a telephone conversation in which the Olsons initiated the call from Virginia to Carmi, Illinois. Mrs. Olson testified that Mr. Olson talked on the phone and said something to the effect, "He said something to the effect in his words, you know, I have a job for your old man, is he there, can I talk to him." After this conversation, the DeLongs packed some of their belongings, left some of their belongings at his parents' house, and went to the State of Virginia.

Gerald Swartout, general manager of Energy Erectors, testified. He was asked whether he was familiar with the manner and mode in which employees are hired by the company for the project and he answered yes. He also indicated that he participated from time to time in the hiring or firing of employees. When asked where was the decision made whether to hire a given applicant for the job, he testified, "At the job site." Swartout also testified that the employee had to fill out payroll forms before going to work, specifically, the W-4, and that he had to go through the safety guidebook and read the rules and regulations and sign the back sheet which was torn out of the safety guidebook. He testified that after these forms are completed the person goes to work and his pay starts at the time he fills out the forms, if he is actually hired. With respect to the company's policy that persons who want to work have to report to the jobsite, Swartout stated: "That is just a normal policy for hourly employees." The benefit to the company in seeing the employee at the jobsite prior to being hired was: "Basically, one of the things we want to make sure the individual is capable, that there was [sic] no physical handicaps." He stated that the job procedures as set forth in his superintendent's field manual were not followed 100% of the time because some employees that were hired did not have to fill out a job application because they had worked for the company previously. They did indicate it was common practice to call and offer a person a job over the phone in many States, but they were not hired until they came to the jobsite. He

gave an example that they would not be hired if they came to the jobsite intoxicated.

From the foregoing, the arbitrator found that the last act necessary to form an employment contract occurred in Virginia rather than in Illinois. As such, he found that Illinois did not have jurisdiction over the claim. The Commission, with one dissenting commissioner, reversed the arbitrator's decision. It found that the employment contract was formed in Illinois and, as such, the petitioner's claim was covered by the Act. The circuit court reversed the Commission, finding as a matter of law that Illinois did not have jurisdiction over the claim.

On appeal, the petitioner argues that the circuit court erred in finding as a matter of law that the employment contract was not entered into in Illinois.

The question of where a contract of hire was made is a question of fact reserved for the trier of fact. (*F & E Erection Co. v. Industrial Comm'n* (1987), 162 Ill. App. 3d 156, 514 N.E.2d 1147.) Only if the undisputed facts permit but a single inference can the question be characterized as one of law. *Corrugated Metals, Inc. v. Industrial Comm'n* (1989), 184 Ill. App. 3d 549, 540 N.E.2d 479.

■ Regarding the jurisdiction question, we note that the Act was designed to have extraterritorial effect. Covered employees include every person in the service of another under any contract of hire, express or implied, oral or written, including persons whose employment is outside the State of Illinois as long as the contract of hire was made within the State of Illinois. (*F & E Erection Co.*, 162 Ill. App. 3d 156, 514 N.E.2d 1147.) The place where the last act necessary to give validity to the contract occurs is the place where the contract was made. Whether the contract of hire was made within Illinois is a question of fact for the Commission, and its decision will not be disturbed unless it is against the manifest weight of the evidence. *Youngstown Sheet & Tube Co. v. Industrial Comm'n* (1980), 79 Ill. 2d 425, 404 N.E.2d 253.

The facts submitted to the Commission show that the contract was formed in Virginia and not in the State of Illinois. As stated in *F & E Erection Co.*, the Act does cover persons whose employment is outside the State of Illinois as long as the contract of hire was made within the State of Illinois.

The evidence shows that the notice of acceptance of the contract by the employee consisted of the physical act of the employee appearing at the jobsite. The testimony of LeRoy Olson, the respondent's project supervisor, shows the following:

"Q. [By counsel for respondent]: So if Mr. DeLong wanted to come and have a job what did he have to do?

A. [By Olson]: Just come out to the job and sign up.

Q. Did he have to come out to Virginia if he wanted the job?

A. Well yes, that's where the job was.

Q. What would have happened if Mr. DeLong had not come to Virginia?

A. He wouldn't have got the job then.

Q. If he had arrived say a month later would he still have had a job?

A. If he would have called me and give me a reason why he couldn't come, had some reason why he couldn't come, I sure would have hired him, sure, if I had an opening.

Q. But if he wanted the job he did have to come to Virginia?

A. Right, right.

\* \* \*

A. I said they had a job.

Q. They had a job?

A. When they made the papers out they had the job, yes. But you couldn't be an employee until you sign the papers.

Q. But you considered them an employee when they reported to the job site because they were paid.

A. On the job site, yes. On the job site."

The Blue Cross-Blue Shield application card signed by decedent on November 30, 1983, shows date of full-time hire, November 28, 1983, which is the first day decedent worked in Virginia for respondent.

■ The Commission's determination that John had accepted the offer in Illinois by leaving the State and traveling to Virginia is not sustained by the record. The last act necessary to give validity to the contract did not occur in Illinois pursuant to the phone call, but in the State of Virginia when John appeared at the jobsite to begin his employment. As stated in *Rosin v. First Bank* (1984), 126 Ill. App. 3d 230, 234, 466 N.E.2d 1245, 1249, concerning an auction and contract, the court stated: "To be valid, an acceptance must be objectively manifested, for otherwise no meeting of the minds would occur." The respondent as offeror had no way of knowing that John had accepted the offer for employment until he showed up at the jobsite.

In *United States Steel Corp. v. Industrial Comm'n* (1987), 161 Ill. App. 3d 437, 441, 510 N.E.2d 452, 455, we stated:

"The place where the last act necessary to give validity to the contract occurs is the place where the contract was made. [Citation.] The last act necessary to give validity to the contract occurred in Indiana, where petitioner accepted the job and began working.

It is not necessary, however, to rely solely on a technical determination of the last act necessary to give validity to the contract. Where the injury occurred in Indiana and the totality of the arrangements for reemployment occurred in Indiana, Illinois has no jurisdiction."

In the instant case, Olson testified that when the respondent needed workers he would review the applications on file, call up applicants and tell them to come to work. If they wanted to come to work, they would come in and sign the papers and then go to work. If a person did not come to the jobsite and sign the various papers, he would not be hired. According to Olson, his wife called Mrs. DeLong in November 1983 and told John to come out and go to work. Olson further testified that all John had to do if he wanted the job was "just come out to the job and sign up." No travel expenses were paid from an applicant's home to the jobsite as an applicant was not hired until he arrived at the jobsite. With respect to the paperwork necessary to be completed before the employee went to work, the witness Olson testified, if you want to go to work "then you go through this procedure, you sign the safety book, and give him a safety book to sign it and the rest of the stuff he had to sign and that was it." Respondent's testimony clearly shows that if the deceased wanted the job, all he had to do was "just come out to the job and sign up." As the arbitrator found:

"Mrs. DeLong confirmed that if deceased wanted the job he had to travel and report to the job site by the following Monday. Thus the offer of employment conditioned acceptance upon the act of DeLong traveling to the job site in Virginia and signing the various papers of employment. This is further supported by reason of the fact that he was not paid for travel expenses or travel time; his pay was commenced when he arrived at the job site."

As stated in Professor Larson's treatise:

"[T]hat the place of acceptance is the place of contract, raises the question in some cases whether the claimant's understanding at the time he sets out toward the second state is a true acceptance of a contract or merely an expectation or hope. A general statement that if the claimant came to the state he

would be given a job *** has been held to fall short of acceptance of an employment contract in the state where claimant received the message." 4 A. Larson, Workmen's Compensation Law §87.32(c), at 16-105 through 16-108 (1990).

The decision of the Commission was against the manifest weight of the evidence and the circuit court of Jefferson County is affirmed.

Affirmed.

EGAN, WOODWARD, STOUDER, and H. LEWIS, JJ., concur.