JOSEPH A. ROSIN, Plaintiff-Appellant, *v.* FIRST BANK OF OAK PARK, Trustee, *et al.*, Defendants-Appellees.

First District (4th Division)   No. 83—1898

Opinion filed July 5, 1984.

George B. Collins and Sandra Hertzberg, both of Collins & Amos, of Chicago, for appellant.

Reuben & Proctor, of Chicago (Don H. Reuben, Shane H. Anderson, and William J. Campbell, Jr., of counsel), for appellees Sheldon F. Good & Co. and Real Estate Auctions, Inc.

Jack D. Jester, Kevin M. Flynn, and Michael T. Trucco, all of Coffield, Ungaretti, Harris & Slavin, of Chicago, for other appellees.

PRESIDING JUSTICE LINN delivered the opinion of the court:

Plaintiff, Joseph A. Rosin, brought suit to specifically enforce a contract for the sale of land bought at auction. At trial, at the close of plaintiff's case, defendants' motions for judgment (Ill. Rev. Stat. 1983, ch. 110, par. 2—1110) were granted on the ground that plaintiff had not presented enough evidence to make out a *prima facie* case on a contract.

On appeal, plaintiff claims that (1) he presented sufficient evidence to establish a *prima facie* case of the existence of a contract arising out of an auction of real estate, and (2) the trial court erred in not weighing the evidence before ruling on defendants' motions for judgment at the close of plaintiff's case.

We affirm the decision of the trial court.

FACTS

Continental Bank was the holder of a first mortgage lien on a 6.5-acre commercial site in Libertyville, Illinois. After the loan went into default and the mortgagor subsequently died, the mortgage indebtedness to Continental exceeded $700,000.

In April 1983, Continental and the representative of the estate of the mortgagor agreed to allow Real Estate Auctions, Inc., to offer the property for sale at public auction to satisfy the mortgage indebtedness. Accordingly, while legal title to the property remained with First Bank of Oak Park under a land trust, Continental's nominee took an assignment of the beneficial interest in the property in exchange for a release of the mortgagor's estate from liability on the mortgage loan. The agreement documenting the release and conveyance reflected a $595,000 "current appraised value" for the property and an outstanding indebtedness of $834,591.80 owed to Continental.

Real Estate Auctions proceeded to arrange for the sale and to prepare and distribute an advertising brochure that announced the sale, described the various parcels to be sold at auction and the financing available, and set forth the terms of the sale as follows:

> "2. The final high bid on *** the 6.5 acres in Libertyville will be offered *with reserve*. These bids must be irrevocable for 24 hours and subject to seller's acceptance. *** The seller on Libertyville reserves the right to reject the high bid by the payment of $1,500 to the high bidder who signs contract.
> * * *

5. Announcements made by Auctioneer at time of sale will take precedence over printed matter. Conduct of auction and increments of bidding at the discretion of the Auctioneer." (Emphasis in original.)

On April 23, 1983, the night of the auction, not only were copies of the advertising brochure available to bidders, but a "green sheet" listing all the parcels was provided for the use of bidders in keeping track of the bidding. The front of the "green sheet" described the auction procedure, noted that one-half of all the lots offered were to be sold without reserve, and concluded by stating that the remaining lots were offered for sale subject to the sellers' acceptance or rejection within 24 hours after the close of the auction.

Between 500 and 700 people attended the auction, among whom were Joseph A. Rosin, owner of the parcel of land adjacent to the Libertyville property up for sale, and his friend, Irving Drobny, who was present for the specific purpose of bidding on Rosin's behalf. The Libertyville property was called for auction by Bruce Sayre, the auctioneer, at approximately 10 p.m. Although the auction was recorded on tape, the beginning of Sayre's call of the Libertyville property occurred while the tape was being changed. However, various plaintiff's witnesses testified that Sayre, after describing the property, the available financing, and the general terms of sale, went on to announce the "Dutch" auction method to be used for the Libertyville property.

According to the witnesses, Sayre also said that the owner had (1) a right to reject the high bid within 24 hours or (2) the right to "buy back" (a) the property or (b) the contract within the same time by the tender of a check for $1,500. The recording resumed with the "Dutch" auction itself. Sayre started the bidding at $800,000, and then, as no bids were forthcoming, lowered the requested amount by $50,000 reductions until, when he called for $500,000, Drobny bid $300,000. When no other bids were made, Sayre knocked down the parcel to Drobny, calling out, "Sold, subject to seller's acceptance." Drobny was then escorted by an employee of the auctioneer to a cashier, where he signed a sales contract as agent "on behalf of an undisclosed principal" and deposited the required $15,000 earnest money with the auction company.

Although representatives of Continental Bank present at the auction maintained that an officer of the bank told Sayre that evening that the bid was rejected, Sayre testified that they did not reject the bid until the next day, April 27. By 5 p.m. on the afternoon of the 27th, Continental gave Sayre the $1,500 check representing the rejection fee, and at 7:47 EST (6:47 CST), Sayre sent a mailgram to

Drobny advising him that the $300,000 bid for the Libertyville property had been rejected.

Drobny informed Sayre by letter on April 29 that because the method of rejection did not comply with the announced requirements, the conditional acceptance of his bid was not binding and effective, and the sale must be consummated immediately. Drobny enclosed the next required payment of $15,000, but when he and Rosin went to Continental Bank to apply for a mortgage later that day, they were turned away. Within a week Rosin's two checks were returned to him along with the $1,500 rejection fee. On May 4, Rosin filed an action for specific performance.

At trial, at the conclusion of the plaintiff's evidence narrated above, all defendants moved for judgment pursuant to section 2—1110 of the Code of Civil Procedure. (Ill. Rev. Stat. 1983, ch. 110, par. 2—1110.) The trial judge, stating that no contract capable of specific performance had been formed because the offer to purchase had never been accepted, granted defendants' motions and ruled that Rosin had failed to establish a *prima facie* case of the existence of a contract. From the entry of the judgment order granting defendants' motions, Rosin now appeals.

OPINION

I

Section 2—1110 of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 2—1110) provides as follows:

> "In all cases tried without a jury, defendant may, at the close of plaintiff's case, move for a finding or judgment in his or her favor. In ruling on the motion the court shall weigh the evidence, considering the credibility of witnesses and the weight and quality of the evidence. If the ruling on the motion is favorable to the defendant, a judgment dismissing the action shall be entered. If the ruling on the motion is adverse to the defendant, the defendant may proceed to adduce evidence in support of his or her defense, in which event the motion is waived."

In an effort to resolve conflicting appellate court opinions concerning the proper procedure to be followed by the court in ruling on a section 2—1110 motion (former section 64(3)), the supreme court, in *Kokinis v. Kotrich* (1980), 81 Ill. 2d 151, 407 N.E.2d 43, stated that the procedure necessitates two steps: first, a determination whether or not the plaintiff has made out a *prima facie* case by presenting some evidence on every element essential to his cause of action; and

second, if a *prima facie* case has been made out, a weighing of the plaintiff's evidence and a subsequent review to see if any evidence necessary to the *prima facie* case has been negated. Judgment in defendant's favor is to be entered if there is insufficient evidence to establish a *prima facie* case following either step. On appeal, the decision of the trial court should not be reversed unless it is contrary to the manifest weight of the evidence. *Getzoff v. Paris* (1979), 77 Ill. App. 3d 401, 396 N.E.2d 260.

In the instant case, the trial court determined that Rosin had not presented some evidence on every element essential to a *prima facie* case in contract. Specifically, the court found no evidence of an acceptance of Rosin's offer by the seller, and there can be no contract without an offer and an acceptance. (*Milanko v. Jensen* (1949), 404 Ill. 261, 88 N.E.2d 857.) We agree with the decision of the trial court.

Rosin's claim to specific performance appears to rest solely on his belief that unless he received a written rejection, payment of the $1,500 rejection fee, and the return of his earnest money deposit, all within 24 hours of the close of the auction, the fall of the hammer following his bid constituted a conditional acceptance that matured into an irrevocable acceptance 24 hours later. However, neither basic contract law nor the application of the rules of auction sales to the facts in the present case support his position.

"The mutual assent necessary to the formation of a bilateral contract *** requires the communicated expression of a promise to purchase and an acceptance in the form of a promise to sell." (*Rothenbuecher v. Tockstein* (1980), 88 Ill. App. 3d 968, 969-70, 411 N.E.2d 92, 94.) To be valid, an acceptance must be objectively manifested, for otherwise no meeting of the minds would occur. (88 Ill. App. 3d 968, 970, 411 N.E.2d 92, 94.) Although an acceptance may be implied under certain specific circumstances, the general rule is that silence cannot be relied upon to establish an acceptance of an offer to enter into a contract. (*Roberts v. Buske* (1973), 12 Ill. App. 3d 630, 298 N.E.2d 795; 1 Corbin on Contracts sec. 72 (1963).) We agree with the trial court that Rosin has failed to present evidence that Continental ever accepted his bid.

In addition to general principles of contract formation, several additional factors unique to auction sales must be considered. "[A] bid at an auction constitutes an offer to buy, the fall of the hammer or any other customary means constitutes the acceptance, and a contract is then made." (*Well v. Schoeneweis* (1981), 101 Ill. App. 3d 254, 258, 427 N.E.2d 1343, 1346.) " 'Unless a contrary intention is manifested, bids at an auction embody terms made known by advertisement, post-

ing or other publication of which bidders are or should be aware, as modified by any announcement made by the auctioneer when the goods are put up.' " 101 Ill. App. 3d 254, 258, 427 N.E.2d 1343, 1346, quoting Restatement (Second) of Contracts sec. 28(2) (1981).

In the present case, in addition to the brochure provisions quoted earlier, the "green sheet" handed out on the night of the auction stated, "The remaining lots [which arguably included the Libertyville property] will be offered for sale subject to the Sellers [sic] acceptance or rejection within 24 hours after the close of the Auction."

In an auction with reserve, the auctioneer, as agent of the seller, invites bids (offers) with the understanding that no bargain exists until the seller has made a further manifestation of assent; the auctioneer may reject all bids and withdraw the goods from sale until he announces completion of the sale. (Restatement (Second) of Contracts sec. 28, comment b; sec. 26 (1981).) Where, as here, the seller has reserved the right to refuse to accept any bid made, a binding sale is not consummated until the seller accepts the bid. When the seller reserves the right to reject any and all bids received, he may exercise this right even after the auctioneer has accepted a bid. 7 Am. Jur. 2d *Auctions and Auctioneers* sec. 16 (1980).

In the present case, the original terms of the contract, as contained in the printed material, included, *inter alia*, (1) the seller's reservation of the right to accept or reject any bid within 24 hours of the close of the auction, and (2) the seller's agreement to pay $1,500 for the right to reject the high bid within the same time period. According to the printed material, while the rejection itself had to be made within the 24 hours, nothing indicated that the same time limit governed either the payment of compensation for the exercise of the right of rejection or the return of the earnest money. Any modification of these terms would necessarily be contained in the oral statements made by the auctioneer before, during, and at the conclusion of the sale of the Libertyville property.

None of the plaintiff's witnesses could remember the auctioneer's exact words as he began the call on the Libertyville property. Most of them testified that prior to the explanation of the "Dutch" auction, the introductory remarks included statements about the seller's reservation of a right to reject or "buy back" the bid, and a 24-hour period. However, they all agreed, and the tape recording confirmed, that the last announcement, made by the auctioneer as the hammer fell, was "Sold, subject to seller's acceptance."

■ Applying the law as explained above to the facts of the instant case, we see clearly that no contract capable of specific perform-

ance ever came into existence. The last statement made by the auctioneer modified the printed terms to the extent that no sale would be final until the seller accepted the prospective purchaser's bid. As stated in *Well v. Schoeneweis* (1981), 101 Ill. App. 3d 254, 258, 427 N.E.2d 1343, 1346, acceptance of a bid at an auction is manifested by the fall of the hammer *or any other customary means*. In an auction in which the seller has reserved the right to reject any and all bids, the "customary means" of acceptance clearly is not the fall of the hammer, but rather is some other objective manifestation of acceptance. Continental never manifested any intent to accept Rosin's bid, no sale was consummated, and no contract capable of specific performance ever came into existence.

Rosin cites the case of *Well v. Schoeneweis* (1981), 101 Ill. App. 3d 254, 427 N.E.2d 1343, as authority for his position that even in an auction subject to seller's approval, the contract is complete at the fall of the hammer. While we agree that the language of the holding appears to support Rosin's position, the facts of the case cast a very different light on the holding.

Unlike the instant case, in which the seller never signed the purchase agreement, in *Well*, following the fall of the hammer, the auctioneer, as agent for the sellers, immediately signed the purchase agreement and accepted the down payment. Because the attempt to alter the terms of the contract occurred only after the sellers had objectively manifested their intent to accept the purchaser's bid, the time reserved for the sellers to exercise their right of approval already had passed and was therefore not a factor in the court's decision. Consequently, we do not agree that *Well* supports Rosin's position, and in light of our analysis explained above, we find that the trial court correctly held that no contract had been formed.

## II

Even if we accept, *arguendo*, Rosin's claim that his right to specific performance did not depend on Continental's acceptance of the offer by some additional objective manifestation but rather on the bank's failure to timely reject the offer, we find that Rosin's bid was, in fact, timely rejected.

By virtue of his contract, the auctioneer is the authorized agent of the seller. (*Well v. Schoeneweis* (1981), 101 Ill. App. 3d 254, 427 N.E.2d 1343.) At the moment the property is struck off, however, "the auctioneer is also made the agent of the purchaser, to the extent of binding the parties by his memorandum of sale *** by the act of the purchaser in giving him his bid and receiving from him, without

objection, the announcement that the property is knocked off to him as purchaser." 7A C.J.S. *Auctions & Auctioneers* sec. 5 (1980); *Yourt v. Hopkins* (1860), 24 Ill. 326.

The nature of the dual agency of the auctioneer is very limited, however. While his authority as agent for the seller begins before the auction and may continue after completion of the sale, his authority as agent of the purchaser begins with his acceptance of the bid and ends with the completion of the memorandum of sale sufficient to take the transaction out of the operation of the Statute of Frauds. (7 Am. Jur. 2d *Auctions & Auctioneers* sec. 55 (1980).) As agent for the purchaser, the auctioneer's authority must be exercised contemporaneously with the sale. (*Doty v. Wilder* (1854), 15 Ill. 407.) However, as long as he serves in some capacity on behalf of both parties pending resolution of any questions concerning the finality of the sale, in regard to that capacity he is treated as agent for both the seller and the buyer. *Ellison v. Kerr* (1877), 86 Ill. 427.

The very restricted nature of the dual agency easily fits within the requirements of an auction sale without reserve; in such a situation, the seller has promised to accept the high bid, whatever it is, and the sale is completed on the spot. (*Diefenbach v. Gorney* (1968), 93 Ill. App. 2d 51, 234 N.E.2d 813.) The auctioneer's agency on behalf of the purchaser lasts only as long as it takes to complete and execute the memorandum of sale.

■ In a sale with reserve, however, the operation of the dual agency is not so easily limited. An agency created to effect a particular purpose terminates only when that purpose is accomplished, and the authority of an agent to complete a business transaction requiring a series of acts is not exhausted by the performance of only one of those acts. (2A C.J.S. *Agency* sec. 109 (1980).) Therefore, in an auction with reserve, the authority of the auctioneer to act as the agent of the purchaser necessarily must extend to cover the period between the making of the high bid and the final disposition of the matter, either the end of the period reserved by the seller for a decision or the decision itself.

Our review of the record reveals that at all times prior to Rosin's receipt on April 29 of the written notice of rejection, each party accepted Sayre, the auctioneer, as his agent. One person may act as agent for both parties to a transaction if he does so with their full knowledge and consent. (*Manda v. Branham* (1977), 50 Ill. App 3d 91, 365 N.E.2d 216.) Drobny and Rosin turned over the $15,000 earnest money to the auctioneer, to be held by the auction firm pending Continental's decision on the bid. All communications between the pur-

chaser and seller during the days after the auction were made through Sayre. Sayre informed Drobny on the day after the auction that he was attempting to locate Vice-President Wood, the bank's representative, in an effort to persuade her to accept Rosin's offer, clearly an act by Sayre that Rosin accepted as being undertaken on his behalf. In turn, Sayre tried to convince Drobny to increase his bid to more nearly match Continental's desired sale price; and when he would not, Sayre, as agent for the bank, accepted Rosin's communication that the bank's rejection had been ineffectual.

After our review of the 24 hours following the close of the auction, we conclude that through Sayre's actions, in accordance with his dual agency, an effective rejection took place. At 4:30 p.m. on April 27, Continental delivered to Sayre the $1,500 rejection fee, thus confirming the bank's oral notice of rejection Sayre had received earlier. In his position as dual agent, Sayre was authorized to take any actions necessary to effectuate a final disposition of the transaction. (See 2A C.J.S. *Agency* sec. 109 (1980).) Similarly, in his position as dual agent, Sayre's receipt of Continental's notice of the rejection constituted notice to and receipt by his principal, Rosin/Drobny. As long as Sayre was acting as their agent by receiving their bid, holding the earnest money, delivering communications to the bank, and arguing on their behalf, they clothed him with authority to accept the bank's notice of either acceptance or rejection. (See *Altrocchi v. Hammond* (1958), 17 Ill. App. 2d 192, 149 N.E.2d 646.) We find, therefore, that by delivering notice and the rejection fee to Sayre, the bank effectively rejected Rosin's bid within the prescribed time period.

In none of the printed material nor in the auctioneer's remarks was any mention made of a 24-hour limit on the return of the earnest money as a condition of an effective rejection. We therefore find that its return was not a condition precedent to an effective rejection.

As a result of our analysis of the law as applied to the facts of the present case, we find that no contract capable of specific performance ever came into being. The plaintiff having failed to make out a *prima facie* case, the trial court was not required to weigh the evidence, and correctly granted defendants' motions for judgment at the close of plaintiff's case. Ill. Rev. Stat. 1983, ch. 110, par. 2—1110; *Kokinis v. Kotrich* (1980), 81 Ill. 2d 151, 407 N.E.2d 43.

Judgment affirmed.

JOHNSON and JIGANTI, JJ., concur.