# IN THE COURT OF APPEALS OF IOWA

No. 24-1163
Filed October 1, 2025

**STEPHEN DIERICKX,**
        Plaintiff-Appellant,

**vs.**

**DREAMDIRT FARM AND RANCH REAL ESTATE, LLC d/b/a DREAM DIRT AUCTIONS, TOM BRADLEY, JASON SMITH, HARRY GATZIONIS, and VAIL HOLDINGS, LLC,**
        Defendants-Appellees.
_____


        Appeal from the Iowa District Court for Muscatine County, Stuart P. Werling, Judge.


        A plaintiff appeals the district court's summary-judgment ruling dismissing his breach-of-contract, negligent-misrepresentation, fraudulent-misrepresentation, consumer-fraud, slander-of-title, and quiet-title claims.  **AFFIRMED.**


        Nicholas J. Huffmon (argued), Elliott R. McDonald, III, and Patrick L. Woodward (until withdrawal) of Brooks Law Firm, P.C., Davenport, for appellant.

        Joseph M. Borg (argued) and William B. Serangeli of Dickinson, Bradshaw, Fowler & Hagen, P.C., Des Moines, for appellees DreamDirt Farm and Ranch Real Estate, LLC d/b/a Dream Dirt Auctions, Tom Bradley, and Jason Smith.

        Alexander Barnett (argued), Douglas R. Lindstrom Jr., and Jenny L. Juehring of Lane & Waterman LLP, Davenport, for appellee Vail Holdings, LLC.

Robert H. Gallagher and Peter G. Gierut of Gallagher, Millage & Gallagher, PLC, Bettendorf, for appellee Harry Gatzionis.

Heard at oral argument by Schumacher, P.J., and Badding and Langholz, JJ.

**LANGHOLZ, Judge.**

Stephen Dierickx was the highest bidder on farmland put up for sale in an online auction conducted by DreamDirt Farm and Ranch Real Estate, LLC. After the bidding closed, DreamDirt emailed Dierickx congratulating him "on your auction purchase" and providing "[a]n invoice for the items you won." But the email also said that earnest funds of "10%" were "due upon Seller's acceptance of your bid." And it reiterated the terms and conditions also posted on the auction website, including that the "[s]ellers reserve the right to take up to 4 hours after bidding ends to accept the final bid" and "[b]eing the high bidder does not form a contract until the auctioneer announces the property sold and you are notified the seller has accepted your bid." About two hours later, DreamDirt emailed again, telling him that the landowner rejected his offer and made a counteroffer at a higher price. He rejected the counteroffer. And the land was later sold to Vail Holdings LLC.

Dierickx then sued, asserting a host of claims against DreamDirt, two of its employees, the landowner, and Vail Holdings and seeking title to the land and damages. But the district court granted summary judgment and dismissed his claims. Dierickx appeals. And we affirm.

Many of Dierickx's claims rest on his theory that he entered a contract to purchase the land when he bid and received the email informing him that he won the auction. But applying longstanding contract law to this twenty-first-century online auction defeats that theory—the undisputed facts showed that no valid contract was formed because Dierickx's bid was an offer that was never accepted by the landowner. And Dierickx's alternative claims based on fraud fail because Dierickx points to no false statements on which he relied to his detriment.

## I.       Background Facts and Proceedings

The summary-judgment record shows the following undisputed material facts.   Harry Gatzionis hired DreamDirt to sell three parcels of farmland in Muscatine County through an online auction.   The agreement provided that the land would "sell subject to Seller's confirmation," that he "has the right but not the obligation to sell at the highest bid during the auction," and that he "will consider the highest bids and will respond within" two hours of the auction's close if observing the auction remotely.

The online auction was held on May 18, 2022.   And when the auction closed, Stephen Dierickx was the highest bidder on one of the three parcels of land—a 55.16-acre parcel that was adjacent to land Dierickx already owned.   His final bid at about 2:34 p.m. was $7770 per acre—for a total price of $428,593.20.

Two minutes later, DreamDirt sent Dierickx an email that began: "Congratulations on your auction purchase!  An invoice for the items you won in the 209.75 Acres Farmland, Muscatine County, IA auction is now ready at MY INVOICE."  The email also provided the invoice details, calculating the "Sale Price" of $428,593.20 and showing that amount that as the "Invoice Total" and "Balance Due."  The email continued on, listing a "pickup location" and a closing date of "[n]o later than 45 days post auction."  But it also said: "Earnest Funds: 10% due upon Seller's acceptance of your bid."

The email then contained a long block of text setting forth the "Terms and Conditions of this auction."  As relevant here, those terms included:

- "Immediately upon the conclusion of the auction the high bidder(s) will enter into a real estate purchase agreement which is a legally binding contract

and deposit with DreamDirt Farm and Ranch Real Estate LLC or other approved holding account the proper non-refundable earnest deposit."

- "Buyer agrees to sign all documents immediately using electronic means and in a reasonable amount of time wire any necessary earnest funds using bank wire."

- "All bids are legally binding offers for real estate."

- "The seller reserves the right to accept or reject any and all bids."

- "Sellers reserve the right to take up to 4 hours after bidding ends to accept the final bid."

- "Being the high bidder does not form a contract until the auctioneer announces the property sold and you are notified the seller has accepted your bid."

The same terms and conditions included in the email were also posted before the auction on the section of DreamDirt's website providing details about the sale of Gatzionis's farmland.[1]

A little less than two hours later, one of DreamDirt's employees called Dierickx to inform him that Gatzionis had rejected his offer to buy the land for $428,593.20. But the employee relayed a counteroffer from Gatzionis for $550,000. Dierickx rejected the counteroffer, informing DreamDirt that he was only willing to pay what he bid and nothing more.

Vail Holdings also bid in the online auction for two of the three parcels of farmland, including the 55.16-acre parcel that Dierickx had bid on. It was the high bidder for the other parcel, and Gatzionis accepted its bid for that parcel. DreamDirt eventually contacted Vail Holdings to see if it was also interested in

---

[1] The parties dispute whether the website required all bidders in the auction to view and accept the terms and conditions before making a bid. Because Dierickx agrees that the terms were posted on the website and that he received them in the email after the close of bidding, we do not find this dispute to be material.

buying the 55.16-acre parcel for $550,000. Vail Holdings rejected that offer but ultimately agreed on a price of $500,000. And in late June 2022, Vail Holdings closed on the purchase of both parcels of land.

In October 2022, Dierickx sued DreamDirt, two of DreamDirt's employees involved in the auction, Gatzionis, and Vail Holdings. First, he claimed that DreamDirt, its employees, "and/or" Gatzionis breached a contract for the sale of the land and sought "specific performance of the contract and/or monetary damages." He also claimed that the same defendants slandered his title to the property by "denying or otherwise misrepresenting [his] equitable interest" in the land. And he brought a quiet-title claim against Vail Holdings seeking an order establishing his equitable interest in the land "and barring and forever estopping Vail Holdings from having or claiming any right or title to the premises."

Dierickx also asserted claims of negligent misrepresentation, fraudulent misrepresentation, and consumer fraud against DreamDirt, its employees, and Gatzionis. All three claims rest on the same allegation that the defendants provided Dierickx "false" information "regarding the auction, the presence or absence of a reserve price, and the acceptance of the winning bid."

Vail Holdings moved for summary judgment on the quiet-title claim arguing that it was a bona fide purchaser of the land without notice of Dierickx's claim to an equitable interest in the land and that Dierickx had no valid equitable interest. DreamDirt and its two employees also moved for summary judgment on the other claims. Among other arguments to defeat each claim, they argued that Dierickx's bid was not accepted, so no contract to purchase the land was formed and his breach-of-contract and slander-of-title claims necessarily fail. And they argued

that they made no false statements about the auction or acceptance of Dierickx's bid on which he relied to his detriment, foreclosing his negligent-misrepresentation, fraudulent-misrepresentation, and consumer-fraud claims. Although Gatzionis appeared through counsel, answered Dierickx's petition, and asserted a cross-claim against DreamDirt and its two employees, he did not move for summary judgment or file any other paper joining in DreamDirt's motion that addressed all the claims asserted against him.[2]

The district court granted both summary-judgment motions and dismissed all Dierickx's claims against all the defendants.[3] The court first held that because the undisputed facts showed that Gatzionis rejected Dierickx's offer within four hours of the close of the auction, "there was not a valid offer and acceptance" and "a contract was never formed." So the court concluded that Dierickx's breach-of-contract claim failed. And the court reasoned that without a binding contract for the land, Dierickx had no equitable interest in the land and his slander-of-title claim against DreamDirt, its employees, and Gatzionis and his quiet-title claim against Vail Holdings both failed.

---

[2] In their brief, DreamDirt and its two employees assert their "counsel's recollection" that "Gatzionis'[s] counsel took part in the hearing on the motion for summary judgment" and "explicitly joined in the arguments in favor of summary judgment on behalf of his client and all of the defendants." But no transcript of the summary-judgment hearing is in our record and the parties have not sought to provide an alternative record of the hearing under Iowa Rule of Appellate Procedure 6.806. We thus cannot consider this factual assertion from the briefing. *See* Iowa R. App. P. 6.801 (defining the record on appeal).

[3] The district court did not separately discuss the claims against Gatzionis. But in its analysis of each claim, it expressly stated that it was dismissing the claim against each of the defendants, including Gatzionis. And in reasoning that another pending motion was moot, the court explained "the case is being dismissed."

As for the negligent-misrepresentation, fraudulent-misrepresentation, and consumer-fraud claims, the court held that the falsity element could not be established. The court reasoned in part that it was undisputed that Dierickx received the terms and conditions in the email from DreamDirt, that the auction was conducted consistent with these terms, and that the email did not say Gatzionis had accepted Dierickx's bid. And so, the court held that none of the defendants falsely represented how the auction would be conducted or that Gatzionis had accepted Dierickx's winning bid.

Dierickx did not file a motion to reconsider or enlarge the district court's summary-judgment ruling under Iowa Rule of Civil Procedure 1.904(2). Instead, he filed this appeal.

## II.     The Contract and Property-Interest-Based Claims

"The public sale of property to the highest bidder by a duly authorized auctioneer is a form of commercial transaction of great antiquity, and still in common use." *Kendall v. Boyer*, 122 N.W. 941, 941 (Iowa 1909). More than a century later—although the venue has sometimes moved from the physical world to the online one—the same holds true. And that long historical tradition provides much common-law precedent governing this twenty-first-century online auction.

An auctioneer has the right to set the terms for the auction—through "posted terms or conditions" and any modifications or additions announced orally by the auctioneer "at the beginning of the sale." *Id.* at 941–42. And those terms and conditions bind bidders and purchasers in the auction whether they are aware of them or not. *See id.* at 941 (affirming jury verdict for damages against the high bidder at a hay auction based on a condition of the auction orally announced by

the auctioneer "at the beginning of the sale" even though bidder "testified that he was not present when such condition was announced, and knew nothing of it").

By default, a bid by a potential purchaser in an auction "is nothing more than an offer on one side, which is not binding on either side until it is assented to." *Swortzell v. Martin*, 16 Iowa 519, 527 (1864) (cleaned up).  Yet "[i]f a bid is made and accepted by the seller, this constitutes a contract, a valid and binding contract, and one which can be enforced either by or against the purchaser." *Id.*  And a bid is considered to be accepted by the seller upon the auctioneer's "knocking down the hammer" if the seller does not first reject the bid or withdraw the property from sale.  *Id.* (cleaned up).  This default auction method is now known as an auction "with reserve."  *Breitbach v. Christenson*, 541 N.W.2d 840, 844 (Iowa 1995); *cf.* Iowa Code § 554.2328 (2022) (providing in the Uniform Commercial Code—Sales, which does not apply to real estate, that "[i]n an auction with reserve the auctioneer may withdraw the goods at any time until the auctioneer announces the completion of the sale"); *see also Marten v. Staab*, 543 N.W.2d 436, 443 (Neb. 1996) (adopting prevailing common-law rule "that 'all auctions are presumed to be with reserve'" absent contrary express terms (quoting *Cuba v. Hudson & Marshall*, 445 S.E.2d 386, 387 (Ga. Ct. App. 1994))); 1 Richard A. Lord, *Williston on Contracts* § 4:12 (4th ed. 2009).

But these default rules can be modified by the terms and conditions of a particular auction.  *See Kendall*, 122 N.W. at 941.  For example, the default auction with reserve may be modified to make the auction "without reserve."  *See Marten*, 543 N.W.2d at 443.  In an auction without reserve—also sometimes called an absolute auction—the default contracting arrangement is flipped.  *See id.*  Placing

the property up for auction becomes an offer to sell at any price that can be revoked only if no bid is received within a reasonable time. *See id.*; *cf.* Iowa Code § 554.2328 (providing—again in the inapplicable UCC—that "[i]n an auction without reserve, after the auctioneer calls for bids on an article or lot, that article or lot cannot be withdrawn unless no bid is made within a reasonable time"). This means that in an auction without reserve, "*the property will actually go to the bidder offering the highest price*, and the seller may not nullify this purpose by bidding himself or through an agent, or by withdrawing the property from sale if he is not pleased with the bids." *Marten*, 543 N.W.2d at 444 (cleaned up).

Conversely, the seller may reserve even greater rights to reject *any* bids— even the highest bid at the close of the auction. Many courts have held that when "the seller explicitly reserves the right to reject or approve, the auctioneer is without authority to accept for the seller" and so, "the fall of the hammer in such auctions merely ends the bidding, and no contract is formed until the seller actually accepts the high bid."[4] *Cuba*, 445 S.E.2d at 388; *see also Young v. Hefton*, 173 P.3d 671, 677 (Kan. Ct. App. 2007); *East v. Brown*, 986 P.2d 523, 525 (Okla. Civ. App. 1999); *Marten*, 543 N.W.2d at 444–45; *Rosin v. First Bank of Oak Park*, 466 N.E.2d 1245,

---

[4] Most courts consider auctions with such a term to be merely a variation of a with-reserve auction. *See, e.g., Cuba*, 445 S.E.2d at 388 (considering such an auction to be with reserve but reasoning "that there is a distinction between auctions which are merely conducted with reserve and those in which the seller explicitly reserves the right to approve, confirm or reject the high bid"); *Marten*, 543 N.W.2d at 443–44 (same). At least one has considered it a third type of auction—distinct from either with-reserve or without-reserve auctions—called a "conditional" auction. *Young*, 173 P.3d at 676. This is merely a matter of terminology—not substance. But since these auctions add an additional reservation of rights for the seller, it seems most accurate to consider them a subset of with-reserve auctions rather than an entirely separate type of auction, like without-reserve auctions.

1249 (Ill. App. Ct. 1984); *Eugene Stud & Veneer, Inc. v. State Bd. of Forestry*, 469 P.2d 635, 637 (Or. Ct. App. 1970); *Cont'l Can Co. v. Com. Waterway Dist. No. 1*, 347 P.2d 887, 888–89 (Wash. 1959); *Moore v. Berry*, 288 S.W.2d 465, 468 (Tenn. Ct. App. 1955); *City of New York v. Union News Co.*, 118 N.E. 635, 636 (N.Y. 1918). In other words, when this additional reservation of rights is made a part of the auction's terms and conditions—unlike the default rule—a seller may reject the high bid even "*after* the close of the bidding." *Young*, 173 P.3d at 676.

Mindful of this governing Iowa authority and the persuasive common-law precedents from other jurisdictions, we agree with the district court that the undisputed facts show that Dierickx's bid was not accepted by Gatzionis and thus that no contract to purchase the land was ever formed. To start, we look to the terms and conditions of this auction to decide whether any of the default common-law rules were modified. *See Kendall*, 122 N.W. at 941. The summary-judgment record shows that these terms and condition are undisputed—they were all written, posted on the auction website in advance, and emailed again in identical form at the close of the auction. And no term or condition governing this auction modified the default rule to turn this into an absolute auction without reserve. Neither the term "absolute auction" nor "without reserve" appears anywhere. And no term limits the seller's default right to withdraw its property from the auction while the bidding is ongoing.

To the contrary, the seller's reserved rights are expanded from the default rules by three of the terms and conditions. First, consistent with the classic text needed to ensure no contract is formed—even after the close of the auction—until the seller accepts a bid, one term provides that "[t]he seller reserves the right to

accept or reject any and all bids." *See, e.g.*, *Cuba*, 445 S.E.2d at 388. Second, another term goes even further by providing that "[s]ellers reserve the right to take up to 4 hours after bidding ends to accept the final bid." And third, to remove any remaining doubt, a term expressly states: "Being the high bidder does not form a contract until the auctioneer announces the property sold and you are notified the seller has accepted your bid." The terms and conditions of this auction thus mandate—with even more force than the terms and conditions in any of the prior persuasive cases—that no contract for the sale of the land was formed with Dierickx when the bidding closed with him as the highest bidder—or ever—unless Gatzionis accepted Dierickx's bid.

The evidence in the summary-judgment record is also undisputed that Gatzionis never accepted Dierickx's bid. Dierickx argues that the email he received from DreamDirt after the close of the online bidding was an acceptance by Gatzionis. But even assuming that an email from DreamDirt—rather than Gatzionis—could be an acceptance on Gatzionis's behalf despite his reservation of that right in the auction's terms and conditions,[5] that email cannot be objectively read to communicate Gatzionis's acceptance to Dierickx. *See Anderson v. Douglas & Lomason Co.*, 540 N.W.2d 277, 285–86 (Iowa 1995) (affirming grant of summary judgment because no contract was formed, reasoning that the existence of the required offer and acceptance must be analyzed "objectively" based on

---

[5] *But see Marten*, 543 N.W.2d at 445 (reasoning that even if auctioneer accepted the high bid, "his acceptance would not be enough to form a contract for the sale of the lands" where auction's terms and conditions reserved right for approval by probate court); *Cont'l Can Co.*, 347 P.2d at 889 (rejecting argument that auctioneer's acceptance of bid was an exercise of the seller's reservation of rights on the seller's behalf).

"what a normally constituted person would have understood the words to mean, when used in their actual setting" (cleaned up)).

True, read in isolation, the first lines congratulating Dierickx "on your auction purchase" and providing "[a]n invoice for the items you won," could suggest that the sales contract was formed. So too might the terms included in the email imposing a duty on the high bidder to "[i]mmediately upon the conclusion of the auction" enter the contract and deposit the "proper earnest deposit." But that reading would conflict with other parts of the email, including its notification that earnest funds of "10%" were "due upon Seller's acceptance of your bid," and its reiteration of other terms and conditions that the "[s]ellers reserve the right to take up to 4 hours after bidding ends to accept the final bid" and "[b]eing the high bidder does not form a contract until the auctioneer announces the property sold and you are notified the seller has accepted your bid." And nothing in the email expressly says that Gatzionis accepted Dierickx's bid. So at best, perhaps the email was the necessary announcement by DreamDirt that the property was sold. But it was not the required notification that "the seller has accepted your bid." And so, by the express terms stated in the email and the governing common law, no contract to buy the land was formed between Dierickx and Gatzionis.

Because Dierickx never entered a contract to buy the land with Gatzionis— or anyone else—his breach-of-contract claim fails. *See Anderson*, 540 N.W.2d at 289 (affirming grant of summary judgment on breach-of-contract claim where summary-judgment record showed that no contract existed). Similarly, without any contract to purchase the land, Dierickx lacks any equitable interest in the land based on that nonexistent contract. *See H.L. Munn Lumber Co. v. City of Ames*,

176 N.W.2d 813, 816 (Iowa 1970) (discussing equitable-conversion doctrine and noting requirement "that the contract" for the sale of land "be enforceable"). So his claim for slander of title based on that alleged equitable interest cannot stand. *See Davitt v. Smart*, 449 N.W.2d 378, 379 (Iowa 1989) (including as one of the five elements of a slander-of-title claim that the plaintiff have "an estate or interest . . . in the property slandered"). Nor can he succeed on his quiet-title claim against Vail Holdings seeking to establish that equitable interest. The district court correctly granted summary judgment dismissing all of these claims.[6]

### III. The Negligent-Misrepresentation and Fraud Claims

Dierickx's final three claims—negligent misrepresentation, fraudulent misrepresentation, and consumer fraud—do not depend on his mistaken theory that he had a binding contract to buy the land. But despite their differing elements, these claims all still rest on a different common theory: that DreamDirt, its employees, or Gatzionis made the same two false representations. First, that they falsely represented the auction was conducted without reserve—meaning that the

---

[6] Dierickx also argues that the district court erred in dismissing his claims against Gatzionis because—unlike DreamDirt and its two employees—Gatzionis did not move for summary judgment. While Dierickx mentioned this issue in a footnote of his summary-judgment resistance without any supporting authority, the district court did not analyze the issue in its ruling dismissing the claims against all the defendants, including Gatzionis. And after the district court ruling, Dierickx still did not bring the overlooked issue to the district court's attention by filing a 1.904 motion. So Dierickx failed to preserve error on this issue, and we decline to consider it for the first time on appeal. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002). It matters not that DreamDirt does not contest error preservation and Gatzionis has chosen not to participate in this appeal because our error-preservation requirement protects interests beyond those "of the opposing party," such as the conservation of limited "judicial resources," and our rules do not require an appellee to file a brief. *Top of Iowa Coop. v. Sime Farms, Inc.*, 608 N.W.2d 454, 470 (Iowa 2000); *see also* Iowa R. App. P. 6.903(3).

highest bidder would purchase without the seller reserving the option to reject the bid. *See Marten*, 543 N.W.2d at 443. And second, that they falsely told Dierickx his bid was accepted. We thus focus on whether Dierickx presented any evidence generating a material factual dispute over whether either false representation was made. *See Bass v. J.C. Penney Co.*, 880 N.W.2d 751, 764 (Iowa 2016) (affirming grant of summary judgment on negligent- and fraudulent-misrepresentation claims where "the undisputed facts reveal that no materially false or deceptive misrepresentation to support [either claim] occurred"); *see also Bagelmann v. First Nat'l Bank*, 823 N.W.2d 18, 30 (Iowa 2012) (setting forth the elements for negligent misrepresentation, including "suppl[ying] false information for the guidance of others in their business transactions" (cleaned up)); *Lloyd v. Drake Univ.*, 686 N.W.2d 225, 233 (Iowa 2004) (setting forth the seven elements of fraudulent misrepresentation, including a "representation" and "falsity" of that representation (cleaned up)); Iowa Code §§ 714H.3, 714H.5 (authorizing private-consumer-fraud claim for, among other things and with other required elements, "the misrepresentation, concealment, suppression, or omission of a material fact").[7]

*A false representation that the auction was without reserve?* Dierickx first argues that DreamDirt, its employees, and Gatzionis falsely represented that the auction was without reserve by concealing that Gatzionis reserved the right to reject the highest bid. But Dierickx does not identify any time that DreamDirt said

---

[7] The consumer fraud statute sweeps in a broader range of conduct beyond just misrepresentations. *See* Iowa Code § 714H.3. But in his pleadings and argument in the district court and on appeal, Dierickx has advanced only the same two false statements that he relies on for his negligent- and fraudulent-misrepresentation claims. So we do not consider whether the record could support other theories of consumer-fraud liability.

the auction was "absolute" or "without reserve." Rather, he points to DreamDirt's marketing materials, criticizing that they did not say that the auction would be "*with reserve*" or refer readers to review the terms and conditions. And he contends that the auction website failed "to confirm that the bidder knew or consented to the Terms and Conditions" of the auction. But none of this is a false representation or omission sufficient to support a claim of negligent misrepresentation, fraudulent misrepresentation, or consumer fraud.

For starters, Dierickx's assumption that an auction is presumed to be without reserve unless the auctioneer says that it is with reserve runs smack into more than 160 years of Iowa precedent and the prevailing view nationally that the default rule is the opposite—an auction bid "is nothing more than an offer on one side, which is not binding on either side until it is assented to." *Swortzell v. Martin*, 16 Iowa 519, 527 (1864) (cleaned up); *see also Marten*, 543 N.W.2d at 443 ("[A]ll auctions are presumed to be with reserve unless they are expressly stated to be without reserve." (cleaned up)). So the absence of an announced change from the default rule is not a concealment that falsely implies the auction would be without-reserve—it would imply *truthfully* that the auction would be with-reserve. What's more, at least one of the marketing pamphlets Dierickx submitted into the summary-judgment record prominently says, under a bold heading "Earnest Money," that "10% due upon Seller's acceptance of your bid," which only fits a with-reserve auction since no acceptance by the seller would be needed in a without-reserve auction.

Perhaps most importantly, Dierickx concedes that the terms and conditions were posted publicly on the auction website's listing for the land. Again, those

terms leave no doubt that the auction was with-reserve, and Dierickx makes no attempt to argue that anything in them was false. This is fatal to a claim that DreamDirt represented anything false about the conduct of the auction. *See Bass*, 880 N.W.2d at 764 (rejecting negligent- and fraudulent-misrepresentation claims about company's shipping and handling charges where website's disclosures accurately described the company's charging practices). And Dierickx's attempt to resurrect it by blaming DreamDirt's website design for not ensuring that he "knew or consented" to the term is without merit. He fails to explain how the absence of such functionality is a misrepresentation or cite any authority supporting tort liability on such a basis. Plus, he again runs into more than a century of auction precedent holding that it is a bidder's obligation to make himself aware of any terms or conditions—even those announced orally when he was not present. *See Kendall*, 122 N.W. at 941–42.

Dierickx's first theory of liability for his negligent-misrepresentation, fraudulent-misrepresentation, and consumer-fraud claims thus cannot succeed.

*A false representation that Dierickx's bid was accepted?* Dierickx alternatively argues that DreamDirt, its employees, and Gatzionis falsely represented that Dierickx purchased the land in DreamDirt's email at the close of the auction "when in fact through the eyes of [Gatzionis] they were merely identified as the High Bidder and the sale was subject to [Gatzionis's] confirmation." But this claim of falsity overlooks that the very same email also represented that "[s]ellers reserve the right to take up to 4 hours after bidding ends to accept the final bid," "[b]eing the high bidder does not form a contract until the auctioneer announces the property sold and you are notified the seller has accepted your bid," and that

Dierickx's earnest funds were "due upon Seller's acceptance of your bid."  So read in context with the rest of the email, the reference to "your auction purchase" could not be reasonably read to mean anything more than the truthful representation that he had won the auction as the highest bidder and would need to await Gatzionis's decision to accept or reject that bid.  The email was not false.

But even if we were to accept Dierickx's interpretation of the first sentence as a false statement that he had a binding contract to purchase the land, this theory of liability still fails for an alternative reason.  Dierickx has failed to come forward with any evidence that he relied on this allegedly false representation to his detriment in the less than two hours between receiving the email and being told that Gatzionis rejected his bid.  *See Gibson v. ITT Hartford Ins. Co.*, 621 N.W.2d 388, 400 (Iowa 2001) (affirming judgment notwithstanding the verdict on fraudulent-misrepresentation claims where record lacked any evidence that representation was relied on); *Bagelmann*, 823 N.W.2d at 30 (noting justifiable reliance is also an element of negligent misrepresentation); *Poller v. Okoboji Classic Cars, LLC*, 960 N.W.2d 496, 522–24 (Iowa 2021) (discussing requirement that consumer fraud cause "ascertainable loss" to the plaintiff to maintain private action for damages).  He argues that the alleged false representation "made him feel committed to purchasing the property" and "creat[ed] a situation where it was difficult for Dierickx to walk away" to "increase the price of the property."  But Dierickx concedes he did not end up paying more for the property—he refused to do so despite the alleged false representation.  And we see no other evidence in the record that Dierickx took any other actions in reliance on his belief that he would be the purchaser of the land or suffered any loss because of it.  For this

reason too, the second alleged false statement cannot support Dierickx's negligent-misrepresentation, fraudulent-misrepresentation, or consumer-fraud claims.

Because the undisputed material facts show that DreamDirt, its employees, and Gatzionis did not make any false statements on which Dierickx relied to his detriment, Dierickx's final three claims also fail. And so, the district court did not err in granting summary judgment and dismissing his negligent-misrepresentation, fraudulent-misrepresentation, and consumer-fraud claims.

**AFFIRMED.**